Per Curiam :
This case was referred by the court pursuant to Rule 45(a), to W. Ney Evans, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed September 15, 1960. Defendant on October 20, 1960, and plaintiff on October 24, 1960, filed notices of acceptance of the commissioner’s recommendation for judgment. Judgment will therefore be entered for plaintiff in accordance with the recommendations of the commissioner.
It is so ordered.
OPINION OP COMMISSIONER
Plaintiff sues for wages lost as a result of his discharge, on July 21, 1952, from his position as shovel operator for the Alaska Road Commission, an agency of the Department of the Interior. Plaintiff was a preference eligible within the meaning of the Veterans’ Preference Act of 1944. His contentions here are (1) that the discharge action itself was arbitrary and capricious and (2) that he was deprived, in several respects, of his rights under procedures required by *411 section 14 of the act and the applicable regulations promulgated thereunder by the Civil Service Commission.
The texts of section 14 of the act and of the applicable regulations are set forth in findings 27 and 28.
Plaintiff was first employed by the Alaska Eoad Commission on October 4,1945, as a temporary employee, assigned to duty as a grader operator. He was entered on the permanent rolls in that grade on September 30,1946, and continued as a permanent employee until his discharge on July 21, 1952. During the first 2 years of his employment, plaintiff was carried on the rolls as a grader operator. He was reassigned as a mechanic for a 6-month period during the winter of 1947-48, and was then returned to grader operator for another 2 years. In May 1950 he was reassigned to the higher grade of shovel operator and retained that grade (subject to some wintertime assignment as grader operator during the winter of 1951-52) until his discharge.
During the period of plaintiff’s employment, graders were considered by the Alaska Eoad Commission to be heavy-duty equipment, and grader operators were called upon from time to time to operate other heavy-duty equipment, including such hoisting devices as power shovels, cranes, and clamshells. It was through such varied assignments that plaintiff worked his way upward in grade from grader operator to shovel operator. During the earlier years of his employment, plaintiff was considered by AEC foremen and general foremen to be as skilled with heavy-duty hoisting equipment as any operator on the rolls. He was called upon at times to instruct other operators in the use of such equipment.
Following the outbreak of hostilities in Korea, in June 1950, there occurred a considerable expansion of general construction activity in Alaska, particularly around Anchorage and Fairbanks. Heavy-duty equipment operators moved into the labor pools in greater numbers than had been the case prior thereto. At the time of plaintiff’s discharge, ample replacements were readily available. In terms of comparative skills plaintiff’s foremen and general foremen had come to regard him, as mediocre to poor, in terms of heavy-duty hoisting equipment, although they continued to consider him a good blade operator.
*412 During the years material here (1945-52) the direction of the Alaska Road Commission was in the hands of engineers. The Commissioner of Eoads, who presided over the headquarters in Juneau, was an engineer, while the Anchorage office was supervised by a District Engineer and an Assistant District Engineer.
These directing officers were intent upon getting done the job their agency had been commissioned to do, namely, the construction, maintenance, and repair of roads. Administrative details were simplified and subordinated to the main task.
Prior to 1951, employment policies were devised and administered by the engineers in comfortable innocence of procedural requirements emanating from the Civil Service Commission in relation to veterans and unclassified civil service employees, and no appreciable effort had been made by the employees to secure representation by a union for collective bargaining.
Wages were based on prevailing rates as determined by ARC in Juneau from data collected there by other Government agencies. Personnel policies were uncomplicated by grievance machinery, seniority system, or disciplinary procedures. Hiring and firing were the exclusive province of the foremen. Lax enforcement was applied to a sketchy system of accident reports. There were no stated standards of safety or schedules for the inspection of equipment. Each foreman ran his own job under the supervision of a general foreman who, in the Anchorage District, reported informally and as his judgment dictated to the District Engineer or the Assistant District Engineer.
Early in 1951 the prospect of increasing construction activity during the summer season resulted in pressure for an increase in the wage scales payable to construction workers. ARC applied to the Department of the Interior for approval of wage increases for its employees. The Department responded by dispatching to Alaska a labor relations adviser on the Washington staff of the Alaska Railroad, to make a survey of ARC’s wage rates in particular and labor relations in general. The survey extended over June and July, October, November, and part of December 1951.
*413 Sometime prior thereto, employees of the Alaska Bail-road had joined Lodge 183 of the American Federation of Government Employees (hereinafter AFGE) in sufficient numbers to obtain recognition of the union by the Bailroad as the bargaining agent of its employees. A policy directive, issued in 1948 by the Under Secretary of the Interior, had proclaimed the right of employees of all agencies within the Department to form or join organizations of their own choosing for purposes of collective bargaining without coercion or restraint by officials responsible for management.
In 1950, Lodge 183 began efforts to draw into membership employees of the Alaska Boad Commission. Plaintiff joined the lodge in September or October 1950, and soon became an organizer for it of ABC employees. A short time later he became a vice president of the lodge. In June 1951, the lodge made its first formal request of ABC for recognition of the union as the bargaining agent of ABC employees.
At just this time (June 1951) the visiting labor relations adviser brought to the attention of ABC’s Commissioner of Boads both the policy directive of the Under Secretary, pertaining to labor organization, and the requirements of civil service regulations pertaining to veterans and other employees of ABC. The policy directive specifically required its distribution among members of the management staff, and the Commissioner of Boads promptly complied, as did the District Engineer at Anchorage, by circulating the memorandum to all general foremen and foremen.
Lodge 183 lacked majority representation of ABC employees, even in the Anchorage area in June 1951, and admitted as much when the requirement was made known to it. Efforts to organize ABC employees were thereupon intensified.
In September 1951, plaintiff was caught in the fall layoff, in that he was required to use his annual leave to carry him for a period while other men with less seniority were retained on the rolls. The layoff lasted into November, when plaintiff was recalled to duty. Meanwhile, he complained widely of discrimination against him because of his union membership and activity.
*414 The reason for the layoff was budgetary. As ARC officials explained to plaintiff and other interested employees, the end of the summer season sometimes found the agency with insufficient funds with which to maintain the needed roster of permanent employees actively at work while providing at the same time for accumulated annual leave. The solution devised by management required the man or men having sufficient leave to use it while others, without adequate leave, were retained at work.
While plaintiff was laid off, the visiting labor relations adviser made an extended trip with the president of the lodge to visit ARC labor camps for the specific purpose of hearing the workmen state their grievances. No one of them complained to the labor relations adviser of discrimination because of union membership or activity.
Meanwhile, plaintiff had succeeded in causing wide discussion of alleged or potential discrimination in the fall layoff. Word of the complaints reached the District Engineer. He thereupon issued a memorandum of disclaimer “To All Anchorage District Personnel
It has been brought to my attention that various employees in the District feel that they are being discriminated against by supervisors for becoming members of a. Federation of Government Employees. This is definitely a misunderstanding on the part of these employees, as such discriminatory practices have never been or shall they ever be employed by the Anchorage District of the Alaska Road Commission. * * *[1]
The findings exonerate the management officials of ARC from charges of discrimination because of union membership or activity, in relation to plaintiff and all other ARC employees. The officials appear from the evidence to have tried in good faith to abide by the requirements of the Under Secretary’s policy directive.
In March 1952, plaintiff was given a job assignment as a crane operator on a project near Cantwell, which was some 300 miles north of his home in Anchorage. The equipment was unfamiliar, the weather was bitter cold, and both living and working conditions left much to be desired. Plaintiff again complained of the assignment as a discrimination *415 against him for union membership and activity, when again the reason was budgetary. He was then the only shovel operator available on the rolls of the Anchorage District.
Two mishaps, described in the findings, occurred while plaintiff was operating the crane at Cantwell. After the second one, the general foreman watched plaintiff operate the crane for a few minutes and concluded from the quivering of his foot on the brake that plaintiff was nervous. He was, but the intense cold probably caused as much shivering as his nervousness caused quivering. Later, when plaintiff injured himself with a hand tool (quite apart from the crane operation) and had to be sent into Anchorage for treatment, his general foreman asked that he not be returned.
Late in May 1952, plaintiff was assigned to operate a clam-shell, loading gravel from a stockpile into trucks, at a project near Anchorage. On June 9, 1952, when it became necessary to replace one of the cables on the clamshell, the driver of one of the trucks, Vernon Heilman, undertook to assist plaintiff in the replacement operation. Plaintiff lowered the bucket to the ground, lowered the boom to rest on the bucket, unfastened and removed the worn cable, and threaded the new cable through the sheave from the bucket along the length of the boom into the housing and fastened it onto the drum.
There were two drums, set in tandem. One drive shaft from the engine provided power for both drums, the power being engaged separately on one or the other by separate clutches. There were also separate foot brakes for each drum. When plaintiff began threading the new cable onto its drum, the engine was running to provide power, and neither foot brake had been set. The drum that was not to be used was idling in a back-and-forth rocking motion. The cable attached to it had been laid, slack, off to one side and out of the way.
The rethreading operation called for Heilman to maintain tension on the new cable with his hands and to guide it in spool-winding as plaintiff applied power to the drum. Plaintiff himself was working the clutch with his foot while he kept his eyes on Heilman’s hands, the one danger in the operation (in plaintiff’s opinion) being the possibility of Heilman’s hands being caught in the winding cable.
*416 Suddenly, and without either Heilman or plaintiff seeing or knowing exactly what happened, Heilman was struck on the back of his neck. The accepted explanation was that the idling drum somehow caused the slack cable attached to it to loop, and that Heilman was struck by the cable loop. In recoiling from the blow, Heilman may have struck his forehead against the housing. In any event, he suffered a rather severe blow, which caused dizziness and pain, because of which he remained away from work for 4 days.
At plaintiff’s suggestion, Heilman drove his truck back into Anchorage, 24 miles away. He had to stop once, en route, because of dizziness. In Anchorage he reported to the AEC office, where he was sent to a doctor for medical attention.
Plaintiff, meanwhile, completed the rethreading of the cable and resumed work with the clamshell. He continued with the work for 2 more days, after which the machine developed motor trouble, and plaintiff sent it into the shop for repairs.
In the shop the district mechanic found evidence of wear of two pins at the far end of the boom, indicating a weakening of the boom itself. He called the Assistant District Engineer, who went to the shop and examined the machine, and reported to the District Engineer. The District Engineer talked with the mechanic and with plaintiff’s general foreman. The latter attributed the damage to plaintiff’s slack line operation. While the District Engineer had also had a report of the Heilman accident, he appears to have been spurred to action by the reported damage to the machine. He directed the Assistant District Engineer to have plaintiff assigned to a grader while he (the District Engineer) considered whether or not there was sufficient cause for plaintiff’s discharge.
The District Engineer did not testify in the case. The Assistant District Engineer (who did testify) did not know what the District Engineer had in mind in taking the matter under advisement: whether he wanted to consider the merits of the case, or the weight of the evidence, or whether he wanted to consult headquarters at Juneau.
Within less than a week, on June 18, 1952, plaintiff was *417 served with, a letter of charges, signed by the District Engineer, designated as a notice of proposed adverse action, wherein it was proposed to remove him from his job as a shovel operator. There followed, on July 1, 1952, further notice that plaintiff would be discharged on July 21, 1952, for the reasons given in the notice of proposed adverse action. Plaintiff was so discharged. The proceedings then and thereafter are reviewed in detail in the findings.
Plaintiff’s contention that the discharge action was arbitrary and capricious in its inception rests on the charge that the action represented discrimination against him because of his union membership and activity. The failure of this contention to find substantiation in fact has been noted above. In connection with the claim of arbitrary or capricious action, however, the findings note the conclusion, based on inference, that the charges preferred against plaintiff did not tell the whole story.
Following is the pertinent portion of finding 14:
* * * The evidence as a whole * * * warrants inferences which are incompatible with the conclusion that plaintiff’s discharge was effected solely on the grounds specified in the charges against him.
* * * The first inference is that, under all of the circumstances of the case as developed by the testimony, neither the Heilman accident nor the damage to the clamshell, nor the impact of the two incidents combined, would have been made the basis of discharge action without other reasons.
* * * It follows (again inferentially) that the District Engineer wanted to get rid of plaintiff for reasons other than the impact of the two clamshell incidents, and had used those incidents as the basis of his action. Among reasons to be inferred as motivating the District Engineer were (1) other instances of alleged carelessness or abuse of equipment by plaintiff and others, for which plaintiff was to be disciplined and made an example ; (2) the knowledge that other heavy-duty equipment operators were then available for hire in the Anchorage area (as they had not been theretofore) and that from the expanding labor pool an operator more skilled than plaintiff might be found; (3) the realization new to the responsible officials of AEC, that civil service regulations would require procedural compliance to effect the discharge of plaintiff (or any other employee), *418 wherefore the discharge of plaintiff should be effected when and while opportunity existed, if it was to be effected at all; and (4) animosity toward plaintiff as explained below.
* * * The inference of animosity is that plaintiff had engendered ill will toward himself on the part of his foremen and general foremen, and of the Assistant District Engineer and the District Engineer, by his persistent claims of discrimination against himself and others and his incitement of other employees to claim discrimination because of union membership or activity. Plaintiff persisted in these claims and efforts to incite in the face of management’s explanations, based on fact and given in good faith, that valid administrative reasons and not anti-union bias lay behind the management actions complained of.[2]
In Gadsden v. United States, 111 Ct. Cl. 487 (1948), cert. denied 342 U.S. 856, this court held (p. 489) :
_ * * * The determination of whether or not a person’s discharge would promote the efficiency of the Government service is vested in the administrative officer and no court has power to review his action if that action was taken in good faith.
On the other hand, if the administrative officer did not act in good faith, if he in fact did not discharge the employee for a cause that would promote the efficiency of the service, but if, on the other hand, he was motivated alone by malice toward the employee, there would seem to be but little doubt that the employee’s rights * * * have been violated.
The decision in Gadsden rested on a demurrer, as was likewise true in Levy v. United States, 118 Ct. Cl. 106 (1950). The essence of both cases is contained in the following paragraph in Gadsden:
The court will not substitute its judgment for that of the administrative officer, but the employee nevertheless has the right to the honest judgment of the administrative officer. If that officer does not render an honest judgment but acts arbitrarily, capriciously, or maliciously, then undoubtedly the rights of the employee have been violated.
*419 In the instant case no finding has been entered that the administrative officer (the District Engineer) acted arbitrarily, capriciously, or maliciously. Whether or not that officer did or did not render an honest judgment with respect to plaintiff’s discharge is a question to which no clear answer can be found in the evidence before the court. In the opinion of the writer, the administrative officer is entitled to the benefit of the doubt under such circumstances. A finding of arbitrary or capricious action must rest on clear proof. Caution is required to avoid even the appearance of having used the device to circumvent the mandate that the court will not substitute its judgment for that of the administrative officer.
The remainder of plaintiff’s contentions relate to alleged deficiencies in the application of administrative due process by the ARC in effecting his discharge and by the Civil Service Commission in confirming the action. More than two dozen separate steps were involved in the administrative processes of discharge, hearing, appeals (five), and decisions (six).
Plaintiff cities five instances of alleged deficiencies on the part of ARC in its application of the discharge procedure and six instances of alleged deficiencies on the part of the agency and the Civil Service Commission in the application of appeal procedures.[3] Inasmuch as one of the alleged deficiencies is fully substantiated, and is patently dispositive of the case, major attention in the remainder of this opinion is directed to it.
The notice of proposed adverse action, served on plaintiff by ARC on June 18,1952, advised him that “[I]t is proposed to effect your removal from your position * * * effective July 21,1952 * * * for improper care of government equipment and operating in a careless manner, endangering the lives of other employees and the general traveling public.[4] *420 Following are the official charge and specifications
Charge: Operation of heavy machinery in such a manner as to endanger other employees and the general traveling public
Specification I: Careless handling of controls and endangering the lives of men working under the machine.
Specification II: Operating without attention to the lines, allowing extensive damage to boom and lines.
In connection with Specification I — On June 9, 1952, Mr. Vernon F. Heilman was assisting in winding the cable drums by holding tension on the cable while you operated the frictions. Apparently unthinkingly you took the slack from all lines, while Mr. Heilman was still in the way and without any warning. The line struck his neck, and only through his own efforts to get out of the way of the moving line was he saved from severe injury.
Incident to Specification II — Inspection of the machine by Mr. O. B. Peterson, District Mechanic, disclosed that you have been operating with excessive slack in both the opening and closing lines. By carelessly allowing 'this slack line to drop- from the guides and wrap around the boom pins, you succeeded in cutting one brace off the boom, cutting one boom section pin almost in two, one main channel almost off and weakening several other bracing members. Damage was so extensive that the machine was actually unsafe to operate, as any normally safe load would cause the boom to buckle. This damage was done over a period of days of careless and improper operation along a major highway where failure in the machine could result in injury to the general public.
By letter dated June 26, 1952, addressed to the District Engineer, plaintiff denied the charges, asserted his belief that the action was instigated as a measure of coercion because of union activity, and requested “a formal hearing, before a judge or judges, not personally involved in the dispute, before whom you may attempt to substantiate your charges.”[5]
*421 On July 1,1952, the District Engineer wrote plaintiff that his employment would be terminated on July 21, 1952, on the basis of the charges previously preferred. The letter advised that plaintiff’s reply of June 26 was “not considered sufficient reason for not taking this removal action,” and that plaintiff could appeal the decision to the Commissioner of Eoads and to the Regional Director of Civil Service in Seattle.[6]
On July 2, 1952, plaintiff addressed identical letters to the Commissioner of Roads and the Regional Director of Civil Service, appealing the District Engineer’s decision of July 1. The letter asserted that plaintiff had been given no opportunity to participate in the investigation, and that he had “asked for a fair and impartial hearing which has in effect been denied him.” The letter closed with a “recommendation” that “the whole proceeding * * * be dismissed, or * * * that a fair and impartial hearing be held in Anchorage.”
On July 14,1952, the Personnel Officer of ARC, stationed at Juneau, replied to plaintiff’s appeal letter of July 2, saying that “this office concurs with the decision of the District Engineer * * and “we regret that your request for a hearing to be held by the Alaska Road Commission cannot be granted.”[7] The Personnel Officer further advised plaintiff *422 of bis rights of appeal to the Regional Office of Civil Service.
On July 21, 1952, plaintiff forwarded to the Regional Director of Civil Service, Seattle, a detailed reply to the charges against him, denying specifically that he had ever “operated any machine in a careless manner,” or had “endangered the life of fellow workers or the general public.” A detailed refutation of the District Engineer’s specifications followed. The letter was accompanied by affidavits in support of plaintiff’s general denial.
On July 21-22,1952, an investigation of the case was made by a representative of the civil service office in Seattle. Details are not in evidence.
On September 17, 1952, the Regional Director of Civil Service wrote to the District Engineer and to plaintiff, asking if either the agency or plaintiff wanted a hearing. The Director said to plaintiff that “the first indication available to this office of your desire for a hearing in Seattle was transmitted to us by a telephone call from” an official of the AFGE.[8]
Plaintiff replied on September 20, 1952, registering his “belief that the evidence gathered by investigation on July 21st and 22nd [was] adequate for a fair decision,” and that:
If a decision can be reached without a hearing and further delay it would be gratefully appreciated by me, *423 however I do not wish to cast aside any attempts that would be necessary to gain a decision in my favor.
The Regional Director evidently interpreted plaintiff’s letter to mean that he was content to rest his case on the results of the investigation, without a hearing.[9] In any event, on October 1,1952, the Regional Director rendered his decision on the appeal. It was adverse to plaintiff.[10]
On October 8,1952, plaintiff appealed the adverse decision by the Regional Director to the Civil Service Commission. The appeal letter denied that plaintiff had ever been a careless operator, noted that his request for a hearing in Anchorage was not granted, protested lack of opportunity to show that ARC “had no consistent over-all policy for discipline of employees involved in loss-of-time damages” (citing eight instances), requested that the decision of the Regional Office be reversed, and closed:
If this cannot be done on the basis of the facts now available, we propose a hearing in Anchorage * * * as the fairest and most practical method of securing additional evidence.
*424 The appeal was referred by the Civil Service Commission to its Board of Appeals and Review. The Board noted plaintiff’s requests for a hearing and remanded the case to the Regional Office for that purpose. The Regional Director accordingly scheduled a hearing in Anchorage, which was held on February 10,1958, by a hearing examiner from Seattle.
Plaintiff was present at the hearing and was represented by counsel. Union officials also attended, as did representatives of the management of ARC. Twelve witnesses were heard, of whom five testified in plaintiff’s behalf. Plaintiff also testified, as did the District Engineer, the Assistant District Engineer, the mechanics who repaired the clam-shell, the general foreman and the foreman in charge at the time of the Heilman accident, and Heilman himself.[11]
Plaintiff appeared at the hearing with a reporter to record the proceedings. The hearing examiner refused to proceed until the reporter had withdrawn, since the subsisting regulations forbade recording by the parties.[12] The examiner did not provide a reporter, but made notes from which he later prepared a summary. The summary was submitted to plaintiff’s attorney for review and suggestions for corrections. The attorney made no response.
On May 18, 1953, the Regional Director, having reviewed *425 the hearing examiner’s summary of the bearing, reaffirmed Ms earlier, adverse decision, advising plaintiff that he found from the record “that the deficiencies alleged in support of your removal are fully substantiated and constitute a reasonable and just cause for the adverse action taken.”[13]
On May 25,1953, plaintiff appealed the Regional Director’s second adverse decision to the Board of Appeals and Review of the Civil Service Commission, and designated as his representative the American Federation of Government Employees in Washington, D.C.
On September 8,1953, the Board of Appeals and Review reversed the decision of the Regional Director, holding that “the charges are not sustained by the evidence” wherefore “the removal action was not justified,” and directed that plaintiff be restored to his position.
On September 18, 1953, the Commissioner of Roads telegraphed the Chairman of the Board of Appeals and Review for “permission to appeal decision mandatory restoration,” expressing his confidence “that discharge was warranted and can be sustained by amplification and clarification of evidence already submitted * *
Following are excerpts from the civil service regulations pertaining to appeals.
* * * An appeal may be made * * * from a decision of the * * * regional director to the Commissioners, U.S. Civil Service Commission * * *. * * *
* * * Appeals under this regulation shall be referred to the Board of Appeals and Review of the Commission * * * for appropriate action.
* * * The Board of Appeals will review the entire record of such further appeals. In its discretion, the Board *426 may afford the parties an opportunity to appear personally and present oral arguments and representations on the procedural aspects of the case and merits of the appeal, but no evidence will he considered hy the Board which could have heen submitted at the time of the original appeal to the * * * regional office. [Emphasis supplied.] If alleged new evidence is offered which was not available at the time of the original appeal, the Board will consider whether the evidence is actually new and of such material consequence ■ that the case should be remanded to the office of original jurisdiction. In exceptional cases the Board may in its discretion receive and consider new evidence without remanding the case and may afford the parties an opportunity to produce witnesses and cross-examine witnesses.
* * * Decisions on appeals to the Commissioners will be transmitted to the appellant or his designated representative and the employing agency concerned with notifications to both parties that no further appeals will be entertained as to the particular case unless new and material evidence is submitted.
* * * The Commissioners may in their discretion, when in their judgment such action appears warranted by the circumstances, reopen an appeal at the request of the appellant, or his designated representative, or the employing agency concerned and may grant both parties an opportunity for a personal appearance. In connection with such reopened appeals, both parties will be afforded an opportunity to submit briefs or written representations.
Presumably, the Board’s restoration decision of September 8,1953, was the decision of the Commission, from which no further appeal was to be entertained “unless new and material evidence is submitted.” Ostensibly, therefore, the authority of the Commission to entertain a further appeal was contained in the escape clause at the end of the regulations.
As far as the evidence reveals, the investigation made in July 1952 by a representative of the Regional Office of Civil Service was confined to the original charge and specifications. The hearing later held (on February 10, 1953) in Anchorage by a Civil Service hearing examiner was likewise so confined. The favorable decision by the Board of Appeals and Review was based on the summary of the hearing.
On October 1,1953, the Commissioner of Roads, ARC, supported his appeal from the restoration decision of the Board *427 of Appeals and Beview by a 5-page, single-spaced, typewritten letter, the purpose of which was said to be “to provide the Board with additional pertinent facts which we believe will fully sustain the charges brought against the employee at the time of his separation.”[14]
This letter asserted that the “specific charge on which the employee was dismissed was the operation of heavy equipment in a careless and negligent manner, injuring a fellow employee, and causing unnecessary and extensive damage to the machine.”[15] The merits of the charge and the specifications were reviewed and reargued at length, interspersed with such comments as: “On numerous occasions prior to this accident supervisors cautioned this operator concerning his recklessness and inattention to duty”; and: “This operator was an habitual ‘slack-line’ operator”; and: “On numerous occasions he had been warned of this particular fault * *
One paragraph in the letter began with this sentence: “That Mr. Shadrick is a careless and unsafe operator is evidenced by the accident suffered by Vernon Heilman.” In succeeding paragraphs details were set forth of seven other incidents, unrelated in time, place, or machine, to the clamshell operation, to show that plaintiff was “both abusive and reckless” and which “clearly demonstrate the incompetency and recklessness of this operator.”
The ABC letter of October 1, 1953, makes clear, beyond doubt, that the original charge and specifications, as contained in the notice of proposed adverse action of June 18, 1952, did not set forth all of the reasons for plaintiff’s discharge. This fact, standing alone, vitiates the proceedings against plaintiff under the court’s ruling in Blackmar v. United States, 128 Ct. Cl. 693 (1954).
The Chairman of the Board of Appeals and Beview forwarded a copy of the ABC letter to the Washington office of the AFGE. The AFGE replied, and a copy of its letter was sent to ABC. The case was not again referred to the Be-gional Office. No further hearing was held, and no serious effort was made to sift the additional charges and specifications against plaintiff contained in the ABC letter.
*428 On March 8, 1954, the Administrative Assistant to the Secretary of the Interior wrote to the Chairman of the Civil Service Commission, directing his attention to the “appeal in the case of Glenn L. Shadrick,” saying:
* * * I think you should know that the action of the Eoad Commission in removing Mr. Shadrick for cause was upheld by the hearing officer from the Seattle office of the Civil Service Commission. In addition, the presentation of the Road Commission * * * to the Board of Appeals and Review has been reviewed here and in our opinion the information contained therein fully supports the action that was taken. * * *
* * * I think * * * if this case is judged on the facts as presented by the Road Commission that the Civil Service Commission will necessarily arrive at the conclusion that Mr. Shadrick’s separation was the only course open since he had failed to respond to reasonable instruction in the operation of the equipment assigned to him.
I am concerned that our efforts to improve the caliber of personnel in the Federal Government will be endangered should we be required to continue the employment of Mr. Shadrick. This is the principal reason why I am calling this matter to your personal attention.
On June 4, 1954, the Chairman of the Board of Appeals and Review wrote the following letter to the Commissioner of Roads, ARC, “by direction of the Commission.”
Reference is made to the appeal of the Alaska Road Commission, Department of the Interior, from the decision of the Board of Appeals and Review reversing the decision of the Eleventh Civil Service Regional Office which sustained the removal action of the Alaska Road Commission and recommending that Mr. Glenn L. Shadrick be restored retroactively to his former position.
The Commissioners, as the result of a careful study of all the evidence developed in this case, including^ your representations and those of the American Federation of Government Employees in behalf of Mr. Shadrick, have determined that the removal action was justified. Consequently, the decision of the Board of Appeals and Review is hereby rescinded and the decision of the Director, Eleventh Civil Service Regional Office, a copy of which was furnished you, is affirmed. [Emphasis supplied.]
*429 In all of tbe decisions preceding tbe foregoing, final decision, no evidence bad been considered other than that gathered in tbe July 1952 investigation and tbe hearing in February 1953. All such evidence was confined to tbe original charge and specifications. There had not been offered to tbe Board any “alleged new evidence * * * which was not available at the time of the original appeal,” wherefore the Board had not been called upon to “consider whether the evidence [was] actually new and of such material consequence that the case should be remanded to the office of original jurisdiction”; nor had it been called upon to consider whether or not this was an exceptional case wherein it might “in its discretion receive and consider new evidence without remanding the case * *
The restoration decision by the Board on an “appeal to the Commissioners” was “transmitted to the appellant * * * and the employing agency concerned” but without “notifications to both parties that no further appeals [would] be entertained as to the particular case unless new and material evidence [was] submitted.” There was no mention in the Board’s decision letter of “further appeals” or of “new and material evidence.”
It was at this point that the Commissioner of Roads, ARC, asked the Board for permission to appeal the decision. The regulations provided:
* * * The Commissioners may in their discretion, when in their judgment such action appears warranted by the circumstances, reopen an appeal at the request of the appellant * * * or the employing agency concerned and may grant both parties an opportunity for a personal appearance.
There is in evidence no recorded action by the Commissioners showing reasons for the exercise of their discretion or that “in their judgment” the reopening of their appeal was “warranted by the circumstances,” or that either party was afforded an opportunity to make a personal appearance. All that appears of record is that the appeal was reopened and that—
* * * In connection with such reopened appeal [s], 'both parties [were] afforded an opportunity to submit briefs or written representations.
*430 Among the “written representations” submitted by the agency and considered by the Commissioners was the 5-page letter from the Commissioner of Eoads to which reference has been made hereinabove. This letter amplified the agency’s arguments concerning the incidents recited in the initial charge and specifications. Whether or not its recitals concerning them constituted “new evidence” in relation to them is immaterial, in view of the basic vices in the letter.
The letter went further than the submission of new evidence. Whereas the original charge had been “operation of heavy machinery in such a maimer as to endanger other employees and the general traveling public,” the AEC letter charged plaintiff with “the operation of heavy equipment in a careless and negligent manner”; “recklessness and inattention to duty”; “habitual slack line” operation, a fault of which he had been “cautioned” and “warned” on “numerous occasions”; “abusive and reckless” actions “which clearly demonstrate the incompetency and recklessness of the operator.” In short, the AEC letter charged the plaintiff with general incompetence and persistent recklessness. This is a broader charge than the charge originally lodged against him.
Whereas the initial specifications charged “careless handling of controls and endangering the lives of men working under the machine,” as illustrated by the Heilman accident, and “operating without attention to the lines, allowing extensive damage to boom and lines,” as shown by the mechanic’s inspection, the AEC letter of October 1, 1953, detailed seven specific additional instances, unrelated in time, place, or machine, to the original specifications, to support the charge of general incompetence and persistent recklessness.
The new charge and specifications were then given moral support by the Administrative Assistant to the Secretary of the Interior who assured the Chairman of the Civil Service Commission of his conviction that the discharge action was fully supported by the information supplied by the Commissioner of Eoads, and of his concern for the Department’s efforts to improve the caliber of personnel in the Federal Government.
*431 The good faith of ARC and Interior officials is not now in issue. Everyone in the Department, from the Secretary to the foreman on the job,[15] may have been convinced beyond reasonable doubt that plaintiff was demonstrably incompetent as a heavy-duty operator, and persistently reckless withal. While the evidence adduced at the trial tends to prove the opposite, the Commissioner of Roads is on record in behalf of his organization that such a belief was the reason for plaintiff’s discharge.
At this point neither the sincerity of their beliefs nor the validity of their opinions as to plaintiff’s competence is material. The immediate concern is with procedure and procedural rights.
Under the statute a preference eligible may be discharged “for such cause as will promote the efficiency of the service.” He is entitled, however, to 30 days’ advance written notice “stating any and all reasons, specifically and in detail, for any such proposed action.” He has the right to answer “personally and in writing,” and to appeal to the Civil Service Commission from an adverse decision of the administrative officer. The statute further specifically provides that the preference eligible “shall have the right to make a personal appearance * * * in accordance with such reasonable rules and regulations as may be issued by the Civil Service Commission,” and the Civil Service Commission is to submit its findings and recommendations to the proper administrative officer “after investigation and consideration of the evidence submitted.”
There is no warrant in the statute for decision by the Civil Service Commission based on ex parte charges by the administrative officer, of which the preference eligible has not been informed and given opportunity to explain or refute. Blackmar v. United States, supra.
The regulations of the Civil Service Commission tracked the statute in defining preference eligibles, in requiring notice of proposed discharge “stating any and all reasons,” in permitting appeals from the adverse decisions of administrative officers, and in requiring investigations. The *432 appeal had to be accompanied by copies of the charges and of the employee’s answer. The employee was to have a hearing, if he desired one, and the hearing was to be on his appeal, i.e., the charges against him and his answer thereto. Hearings were to be conducted “in an informal maimer.” While “rules of evidence [would] not be strictly applied,” opportunity was to be “afforded for the introduction of evidence, including testimony and statements by the appellant and his designated representatives and witnesses and representatives of the employing agency and witnesses, and for the cross-examination of witnesses.”
The statute and the regulations thus contemplate a comprehensive statement, in the charge and specifications, of all reasons for the proposed discharge, to be followed by investigation and, if requested, hearing. Manifestly the investigation and hearing should be concerned with the charge and specifications.
Against this background the references (in the regulations governing appeals) to “new evidence” clearly relate to new evidence bearing on the charge and specifications, and not to new charges, or new grounds for the disciplinary action, or to support of such new charges by reference to other incidents unrelated in time or place to the incidents initially recited. A contrary interpretation would do violence to the fair play inherent in the schematic design of the charge- and-appeal procedure.
In the instant case the Civil Service Commissioners, ostensibly operating within the terms of the general escape clause at the close of their regulations, exercised their, discretion to reopen the appeal at the request of the employing agency concerned and afforded both parties an opportunity to submit written representations. The Alaska Eoad Commission, supported by the Department of the Interior, embraced the opportunity to “throw the book” at plaintiff.
It should have been apparent to the Commissioners that the initial charge and specifications had been enlarged from the two instances of alleged carelessness to a broadside charge of demonstrated incompetence and persistent recklessness, and that the documentation had been increased from two incidents to nine, presenting a charge and seven *433 specifications which were wholly outside of the case at its inception. All of the newly cited incidents, moreover, appeared on their face to have occurred before the clamshell incidents on which the initial charge was based, wherefore evidence concerning them was available to the agency when it first stated its charge and specifications.
Whatever may have been the rationale of the Commissioners in considering, in the reopened appeal, the extensive extraneous evidence submitted by the Commissioner of Eoads, the resulting decision was not the decision of an “appeal” within the meaning of its regulations. The Commissioners decided another and different case, which had been presented ex parte by the employing agency with the consent of the Commission. This was a violation of plaintiff’s rights under both the statute and the regulations.
“An executive agency must be rigorously held to the standards by which it professes its action to be judged. * * * Accordingly, if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. * * * He that takes the procedural sword shall perish with that sword. * * *•” Mr. Justice Frankfurter, concurring, in Vitarelli v. Seaton, 359 U.S. 535, 546, 547 (1959).
In Wittner v. United States, 110 Ct. Cl. 231 (1948) the Commission itself ordered the restoration of the employee to his former position when it found that “the charges, or written statement of reasons, did not, in fact, set forth all the agency’s reasons for taking the adverse action.”
Plaintiff is entitled to recover.
If the amount of the recovery is established by the evidence, I have been unable to decipher it. Neither of the parties has submitted adequate requests for findings relating to the amount of wages lost or the amount of earnings since the discharge. Further proceedings under Eule 38(c) will therefore ¡be necessary to determine the amount of wages plaintiff would have earned if he had not been discharged and the amount of his earnings since his discharge.
Finding 29 establishes the fact that plaintiff suffered pecuniary loss as a result of the discharge; that he was dili *434 gent in seeking employment elsewhere and moderately successful in the endeavor; but that he would have earned more if he had been retained by ARC.
Plaintiff’s brief, moreover, asserts his right to have the compensation he would have received, had it not been for his wrongful discharge, computed on the basis of the rate of his wages at the time of his discharge, amplified by general increases or within grade raises applicable to his position since his discharge. Defendant’s brief does not challenge the assertion. The contention is sustained by the decisions of this court in Crocker v. United States, 130 Ct. Cl. 567 (1955), and McGuire v. United States, 145 Ct. Cl. 17 (1959).
FINDINGS OF FACT
1. (a) Plaintiff, a veteran preference eligible,[1] was initially enrolled as a temporary employee of the Alaska Road Commission [2] (hereinafter ARC) on October 4, 1945, and was placed on the permanent rolls on September 30,1946.
(b) Plaintiff was assigned and served as a grader operator from October 4, 1945, to November 29, 1947, when he was reassigned as a mechanic, a capacity in which he worked until April 12, 1948, when he returned to grader operator. On May 22, 1950, he was reassigned as a shovel operator. He continued in this assignment until June 12, 1952, and was so carried on the rolls at the time of his discharge on July 21,1952.
2. (a) The function of ARC, as its name implies, was to build and maintain roads and highways in the Territory of Alaska. The work included the usual clearing, grubbing, grading, and surfacing (usually with gravel), and the construction of culverts and bridges.
(b) The headquarters of ARC were in. Juneau, under the supervision and direction of the Commissioner of Roads, who, at the times material here, was an engineer.
(c) A district office was maintained in Anchorage, where *435 the District Engineer was in charge under the supervision of headquarters. The second in command of the district office was the Assistant District Engineer.
The Anchorage District encompassed a large area in southwest Alaska. Because of the concentration of work near Anchorage, the district office recognized a smaller area in the immediate vicinity of Anchorage as the Anchorage area.
(d) Within the Anchorage District, at the times material here, there were two or more general foremen who reported to the District Engineer or the Assistant District Engineer. Each general foreman supervised several work crews, each of which was under the supervision of a foreman.
3. (a) Climate was, of course, a controlling factor in the work of the ABC in the Anchorage District. Major projects were usually pressed during the summer season, which extended from late May or early June into September or October, depending upon the disappearance and reappearance of heavy snow.
(b) During the summer season ABC expanded its employment rolls to some four or five times the size of the winter season roster. These seasonal workers were hired as temporary employees, for release at the end of the summer. Permanent employees remained on the rolls the year round, and normally worked a 40-hour, 5-day week all winter. During the summer, and occasionally in the winter, they worked overtime as the exigencies of the program required.
(c) During the years immediately after the war (1945-1950), general construction work in Alaska was not as widespread as it was in the years after 1950 (which marked the beginning of the Korean episode). Prior to 1950 the labor pool from which to select men qualified to operate heavy equipment was appreciably smaller than it was in later years, when the expansion of construction activity drew many more men to Alaska.
4. (a) Prior to the summer of 1951 (and, inferentially, during that summer), wage scales payable to ABC employees were determined by headquarters at Juneau on the basis of prevailing rates as determined by ABC from data collected by other governmental agencies in Juneau.
*436 (b) Unionization of AEC employees in the Anchorage District was undertaken in 1950 and 1951 by Lodge 183 of the American Federation of Government Employees (hereinafter AFGE), an affiliate of the American Federation of Labor. AFGE had theretofore organized the employees of the Alaska Railroad. Its efforts to organize the employees of ARC, however, were not successful during the times material here (1951-52), in that the AEGE never became the bargaining agent for ARC employees.
(c) Absent unionization and standards normally developed through collective bargaining, ARC had no well defined personnel policies or practices. Hiring and firing of workmen rested with the various foremen. This practice applied to permanent as well as to temporary employees. There were no grievance procedures, seniority system, or inspection and safety programs. There were no stated policy and no recognizable course of conduct relating to the discipline of employees or to what the Administrative Assistant to the Secretary of the Interior later described as “efforts to improve the caliber of personnel.” Accidents were supposed to be reported in writing by the workmen at the time of their occurrence or by the foreman if he saw what happened. The requirement was honored in the breach more than in observance.
(d) Ungraded employees and veterans were entitled to the benefits of applicable civil service regulations, but this fact was unknown to ARC officials until the summer and fall of 1951. The discharge of plaintiff in 1952 represented ARC’s first encounter with civil service procedures.
5. (a) Finding a wage increase desirable for use in the 1951 summer season, ARC applied to the Department of the Interior for approval. The Department thereupon dispatched to Alaska a labor relations adviser who was then on the Washington staff of the Alaska Railroad to make an exhaustive field survey of ARC wage rates and labor relations. The adviser was in Alaska during June and July, October, November, and part of December 1951, engaged, for the most part, in the ARC survey.
(b) Theretofore, in January 1948, the Under Secretary of the Interior had issued to the “Heads of All Bureaus and *437 Offices” a comprehensive memorandum setting forth “General Labor Eelations Policy for Ungraded Employees of the Department of the Interior.” The memorandum noted that “[EJmployees in the public service are relying in increasing numbers on the organized labor movement to advance their welfare as wage earners,” and that “* * * results beneficial to employees, management, and the public are realized when public employees acting through responsible labor organizations are enabled to participate in the orderly determination of rates of pay, regulation of hours and working rules, and to cooperate with management in achieving the public purpose for which the agencies employing them have been established * * The memorandum declared the right of ungraded employees “to form or join organizations and designate representatives of their own choosing * * * free from any and all restraint, interference or coercion on the part of departmental officers * * * and supervisors * *
(c) This memorandum was brought to the attention of the Commissioner of Eoads of AEC by the visiting labor relations adviser, and copies of it were distributed, in conformity with instructions contained therein, to the field and supervisory staffs of AEC, including foremen and general foremen in the Anchorage District.
(d) While there is no specific evidence on the point, the inference is warranted by the evidence as a whole that the labor relations adviser also brought to the attention of the Commissioner of Eoads and his subordinates in the AEC the applicability of civil service regulations and procedures (including veterans’ preference rights) to situations involving discharges for the good of the service.
6. (a) Plaintiff joined Lodge 183 of the AEGE, which was then the bargaining agent for employees of the Alaska Eailroad, in September or October 1950. He soon became an organizer for the union of AEC employees. A short time later he was elected a vice president of the lodge.
(b) During the summer of 1951 the effort of the AFGE to organize the employees of AEC was in full swing. On August 13, 1951, Lodge 183 addressed a letter to the Commissioner of Eoads making “formal request that we be duly *438 recognized as sole bargaining agent for the employees of the Alaska Road Commission.”
(c) Thereafter, the Commissioner of Roads and management subordinates met and conferred with officers of the union. Recognition of the union as bargaining agent for ARC employees was withheld pending proof by the union, to the satisfaction of management, of majority representation. The union had majority representation in the Anchorage area, but not in the Anchorage District or in the Territory served by ARC. Recognition was never given because of the failure of management and the union to agree upon either an appropriate geographic unit within which the union could show majority representation or a cutoff date upon which to base the roster of employees.
(d) On September 20, 1951, plaintiff was required to begin a period of annual leave (for which he was duly paid). The leave period lasted until November 5,1951, when he was restored to active duty. During this period men with less seniority than he were retained on active duty. Plaintiff complained widely of discrimination against him because of his union activity. The reason for his layoff was budgetary. During slack periods after the summer season ARC occasionally required some men to use accumulated leave, for which they were paid, in order that others who lacked adequate leave might continue in employment. Such action was taken because of a lack of sufficient funds to maintain employment and provide for leave at the same time.
(e) On October 6, 1951, the District Engineer forwarded to “All Anchorage District Personnel” the following memorandum:
It has been brought to my attention that various employees in the District feel they are being discriminated against by supervisors for becoming members of a Federation of Government Employees. This is definitely a misunderstanding on the part of these employees, as such discriminatory practices have never been or shall they ever be employed by the Anchorage District of the Alaska Road Commission.
Our employment procedures have been established by Civil. Service Regulations so far as they are applicable, and it is not within our jurisdiction to deviate from such regulations. These procedures take into considera *439 tion veteran’s preference, length, of service, performance ratings, and various other factors, and we feel that they are well adapted to our short season and methods of work.
It is not a policy of this Agency to dictate in the private lives or personal affairs of any employee, and it is immaterial to us whether or not any employee belongs to a Lodge. Our only justification for existence is the accomplishment of construction and maintenance of highways in Alaska, and we shall continue to employ the best men available and retain those men as long as we can through our present personnel methods. Any changes in our procedures shall be on direct orders from our Juneau Headquarters Office.
(f) Shortly after the distribution of the foregoing memorandum, the visiting labor relations adviser accompanied the president of Lodge 183 on a trip to various work camps of the ARO to talk with employees about grievances. None of the men interviewed complained to the labor relations adviser of discrimination against them because of union membership or activities.
(g) The inference to be drawn from the evidence as a whole is that the District Engineer’s memorandum was made necessary, in his judgment, by plaintiff’s widespread complaint of discrimination for union activity because of his September layoff, and that plaintiff had incited others similarly subjected to temporary layoffs to make the same complaint.
(h) No specific instance of discrimination by management against employees because of union activity or membership has been established by the evidence.
(i) With respect to the second paragraph of the District Engineer’s memorandum, relating to the application of civil service regulations to ARC employment procedures, there is no evidence of attention having been given by ARC to performance ratings, and only one passing reference to consideration of length of service.
7. (a) Plaintiff, as heretofore noted, was initially employed as a grader operator. He remained in that assignment during the first 2 years of his employment by ARC. Then, after a 6-month tour, in the winter of 1947-1948, as a mechanic, he put in 2 more years as a grader operator. He *440 operated graders from time to time after his reassignment as shovel operator in 1950. All of the men with whom plaintiff worked, including his foremen and general foremen, considered him to be a competent grader operator.
(b) Graders, being heavy-duty earth-moving machines, were considered heavy-duty equipment, although they dif-ered in size and kind from such other heavy-duty equipment as cranes, power shovels, and clamshells. Nevertheless, in ARC work during the years 1945-1950, a man who could operate a grader was considered a heavy-duty equipment operator, and was expected to operate machines other than graders as occasion might demand. It was in this way that plaintiff rose from grader operator to the higher skilled assignment of shovel operator. In the course of his developing experience he was as competent as any and more competent than most of the heavy-duty operators in the Anchorage area. At one time he was called upon to instruct others in the use of the heavier machines. By the time of his discharge in 1952 he had at one time or another operated every machine ARC had.
(c) After 1950, with the influx of men and equipment into Alaska for the expanding construction program, many heavy-duty operators appeared in the labor market. Some of them had had more experience and had developed higher skills than plaintiff.
8. In the course of his employment, over a period of almost 7 years, plaintiff had one mishap with a grader and five mishaps with heavier, hoisting equipment. No serious injuries resulted from any of them. The evidence is conflicting as to the extent, if any, to which plaintiff’s supervisors attributed fault to him, or criticized, admonished, or reproved him, because of these mishaps prior to the accident with the clam-shell in 1952 which was made one of the bases of his discharge. The evidence is clear that his general reputation among his fellow workmen, as a careful, competent operator of heavy-duty equipment, was not impaired by these mishaps.
9. (a) In March 1952, ARC needed a crane operator to work on bridge construction at Cantwell, some 300 miles north of Anchorage. Plaintiff, as the only shovel operator then on the permanent rolls of the Anchorage District, was *441 assigned to the job. Plaintiff’s home was in Anchorage, and his employment during the winter season had theretofore been confined to the Anchorage area. Plaintiff resented the assignment because it took him away from home, to work in extremely cold weather, on equipment with which he was not wholly familiar and which was, in fact, rather precariously located. He again complained of discrimination against him because of his union activity.
(b) The crane was perched on the end of an uncompleted span of the bridge, placing the operator some 15 or 18 feet above the ice. Special weights had been attached to it to preventing it from tilting. The work to be done with the crane included the lifting and moving of quantities of lumber which had been unloaded from trucks and stacked on the ice. Two men were required to transmit signals to plaintiff, being one to attach the cables to the load, and one stationed in front of the crane to receive and transmit signals from the other.
(c) Loads of lumber sometimes became frozen to the ice, and required sharp pulls to dislodge them. On one occasion a load of lumber resting off to one side of the crane, requiring extra force to dislodge it from the ice, swung free like a pendulum and, before plaintiff could lower it, swung into a scaffold under the bridge, knocking the scaffold down and causing a man standing on it to fall 12 or 15 feet to the ice. Except for bruises, the man was not hurt.
(d) On another occasion, plaintiff slackened the hoisting cables too rapidly, thereby permitting the load to fall a few feet while a rigger was on it. The potential of danger was greater than any harm actually resulting from the lapse of control.
(e) Thereafter, the general foreman watched plaintiff, from a distance of 50 or 75 feet, as he operated the crane and noticed plaintiff’s foot quivering as it rested on the brake. The foreman attributed the quivering to nervousness. Plaintiff ascribed it to the cold. The inference is that both the cold and plaintiff’s feeling of insecurity contributed to the quivering.
(f) A few days later plaintiff injured himself (with equipment unrelated to the crane) and had to be sent back *442 to Anchorage for medical attention. The general foreman asked that he not be returned, and he did not return.
10. (a) In late May 1952, plaintiff was assigned to operate a clamshell for the loading of gravel from a stockpile into trucks. The stockpile and clamshell were situated far enough (100 feet) from the highway not to interfere with or endanger passing traffic.
(b) The clamshell had been purchased new in 1949 by ARC. It had been in operation at various times by various men. Plaintiff had never before operated it. Immediately upon his assignment to the machine, plaintiff recognized a dangerous situation in the mounting of it on a truck chassis, in that the muffler and exhaust pipe of one machine were too close to the gasoline tank of the other. Serious protests by plaintiff were required before ARC mechanics were persuaded to remedy the situation.
(c) Except as noted in the preceding paragraph, the evidence does not satisfactorily establish the condition of the clamshell at the time plaintiff was assigned to operate it. ARC had no specific policy or schedule for the inspection or maintenance of machines, except that each operator was expected to look after the equipment with which he was working, and to report it or send it in for repairs as needed. The evidence does show that the clamshell in question had had some hard use before plaintiff undertook its operation.
11. (a) On June 9,1952, plaintiff found it necessary to replace one of the two cables which controlled the operation of the clamshell. The driver of one of the trucks, Vernon Heilman, assisted him in the operation.
(b) Plaintiff lowered the bucket until it was resting on the ground. He then lowered the boom to rest on the bucket. The worn cable was unfastened from the bucket and from the drum and removed. The new cable was threaded through the sheave at the far end of the boom, pulled back to the housing and fastened to the drum. The operation then required plaintiff’s assistant, Heilman, to guide the cable onto the drum as plaintiff rotated the drum with the engine, using the clutch for control.
(c) The two cables on the machine were controlled by separate drums, set in tandem. One drive shaft from the *443 engine supplied latent power for both drums, actual power being engaged on either by separate clutches. Each drum also had its separate foot brake. In the rethreading of the new cable, plaintiff had not set the foot brake on either drum. As a consequence, the drum not in use in the re-threading was idling, not turning, but rocking back and forth to the extent of approximately one-half turn.
(d) While plaintiff was operating the rethreading drum, he was watching Heilman’s hands, since the greatest danger in the operation lay in the possibility of Heilman’s hands being drawn into the spooling of the cable on the drum. Heilman, in turn, was watching the threading cable, to see that it maintained the proper tension and the proper path. Without warning, and without either plaintiff or Heilman being able to see exactly what happened, Heilman was struck on the back of his head, below one ear, ostensibly by the cable attached to the idling drum.
(e) The accepted explanation of the accident was that the idling drum caused the slack cable attached to it to loop, and that it was a cable loop that struck Heilman. Whether or not Heilman, in recoiling from the contact of the cable with the back of his head or neck, instinctively recoiled in such a way as to strike his forehead against the housing of the machine is not clear. He did, however, in some manner receive a blow to his head which caused considerable dizziness as well as pain, and because of which he received medical attention and was away from work for 4 days. Heilman was able to drive his truck 24 miles into Anchorage, although he had to stop briefly on the way because of dizziness.
12. (a) After Heilman left, plaintiff completed rethread-ing the cable and resumed work with the clamshell, continuing for 2 more days. The machine then developed engine trouble and was sent to the shop for repairs.
(b) In the shop, mechanics found the clamshell in need of repairs other than to the engine. One end of the boom appeared to have been weakened, and one boom pin had been worn almost in two, apparently by action of moving cables against it. The district mechanic called the Assistant District Engineer, who went to the shop, inspected the machine, and reported to the District Engineer. Meanwhile, *444 a report (oral or written) of the Heilman accident had reached the District Engineer and the Assistant District Engineer.
(c) The District Engineer called into conference the district mechanic and the general foreman. After talking with them and the Assistant District Engineer, he ordered that plaintiff be assigned to a grader while he considered whether or not there was sufficient reason to fire plaintiff.[3]
(d) The general foreman with whom the District Engineer conferred had always considered plaintiff to be a good blade (grader) operator but a poor operator of hoisting equipment. He expressed the opinion to the District Engineer that plaintiff was responsible for the damage to the clamshell because of his persistent use of slack lines.
(e) The evidence indicates that the District Engineer was more concerned with the damage to the clamshell than he was over the seriousness of the Heilman accident.
(f) It is not established by the evidence that plaintiff was responsible wholly, or in major part, for the damage to the clamshell. Plaintiff was somewhat given to slack line operation, and slack lines contributed to and may have been the sole cause of the damage. Slack line operation is, however, a matter of degree. The evidence is incomplete in showing that the damage was primarily caused during plaintiff’s brief period of operation, and it is unconvincing that plaintiff was given to slack line operation in greater degree than other men to whom the machine had been entrusted.
(g) The shop mechanics repaired the clamshell. They fastened a brace to one side of the outer end of the boom and replaced two boom pins. Meanwhile, another machine (and another operator) had been sent to the job where plaintiff had been using the clamshell, and the repaired machine was sent elsewhere, some distance from Anchorage. It was not available for inspection after charges were preferred against plaintiff.
13. (a) On June 18,1952, the Assistant District Engineer delivered to plaintiff a letter signed by the District Engi *445 neer, notifying plaintiff of proposed adverse action, specifically, to effect bis removal from Ms position as shovel operator effective July 21, 1952. The letter contained a charge (“Operation of heavy machinery in such a manner as to endanger other employees and the general traveling public”) and two specifications: (1) “Careless handling of controls and endangering the lives of men working under the machine”; and (2) “Operating without attention to lines allowing extensive damage to 'boom and lines.” [4]
(b) Plaintiff understood the purpose of the notice of adverse action to be to effect his discharge. He did not, as his counsel now suggests, understand the notice to mean his demotion from shovel operator to grader operator.
(c) Plaintiff’s discharge for cause was effected on July 21, 1952.
14. (a) Plaintiff alleged in his petition, asserted at the trial, and contends in Ms brief that the action of ARC in effecting Ms discharge was arbitrary and capricious, in that the discharge action was motivated by discrimination against Mm because of Ms membersMp in and activity on behalf of the labor umon.
(b) No anti-union bias, in the sense of preventing or discouraging employees from joining the union, animated the top echelon of ARC, consisting of the Commissioner of Roads, the Personnel Director in the Juneau office, the District Engineer and the Assistant District Engineer of the Anchorage District. The memorandum quoted in finding 6(d) was issued in good faith. The policy therein enunciated was fully implemented by management (including general foremen) with respect to all ARC employees.
(c) The evidence as a whole nevertheless warrants inferences which are incompatible with the conclusion that plaintiff’s discharge was effected solely on the grounds specified in the charges against him.
(d) The first inference is that, under all of the circumstances of the case as developed by the evidence, neither the Heilman accident nor the damage to the clamshell, nor the impact of the two incidents combined, would have been made the basis of discharge action without other reasons.
*446 (e) It follows (again inferentially) that the District Engineer wanted to get rid of plaintiff for reasons other than the impact of the two clamshell incidents, and used those incidents as the basis of his action. Among reasons to be inferred as motivating the District Engineer were (1) other instances of alleged carelessness or abuse of equipment by plaintiff and others, for which plaintiff was to be disciplined and made an example; (2) the knowledge that other heavy-duty equipment operators were then available for hire in the Anchorage area (as they had not been theretofore) and that from the expanding labor pool an operator more skilled than plaintiff might be found; (3) the realization, new to the responsible officials of ARC, that civil service regulations would require procedural compliance to effect the discharge of plaintiff (or any other employee), wherefore the discharge of plaintiff should be effected when and while opportunity existed, if it was to be effected at all;[5] and (4) animosity toward plaintiff as explained below.
(f) The inference of animosity is that plaintiff had engendered ill will toward himself on the part of his foremen and general foremen, and of the Assistant District Engineer and the District Engineer, by his persistent claims of discrimination against himself and others and his incitement of other employees to claim discrimination, because of union membership or activity. Plaintiff persisted in these claims and efforts to incite in the face of management’s explanations, based on fact and given in good faith, that valid administrative reasons and not anti-union bias lay behind the management actions complained of.[6]
*447 15. (a) Plaintiff’s petition further alleged and he now contends in his proposed findings of fact and brief that prejudicial lapses occurred in the application to his case of civil service requirements.
(b) The pertinent provisions of the Veterans’ Preference Act of 1944 are set forth in finding 27.
(c) The pertinent civil service regulations are set forth in finding 28.
(d) Procedural incidents of plaintiff’s case, from the initial notice of proposed adverse action to the final ruling of the Civil Service Commission upholding the ARC discharge action, are set forth in findings immediately succeeding.
16. (a) On June 17, 1952, the Secretary of Lodge 183, AFGE, addressed the following letter to the District Engineer :
In accord with the General Labor Policy of the Department of the Interior, we request that you hold a hearing to substantiate verbal charges resulting in unwarranted reduction in salary for Mr. Glen L. Shad-rick. A ten day time limit is usually sufficient to arrange a hearing unless extended by mutual consent.
*****
(b) When the foregoing letter was written, plaintiff had been reassigned, informally, to grader operator (1) because the clamshell had been removed from the job and (2) on orders of the District Engineer while he considered whether or not plaintiff should be fired. Plaintiff’s salary had not been reduced, and there is no evidence relating to the “verbal charges.”
17. (a) Following is the text of the letter of June 18,1952, addressed to plaintiff, signed by the District Engineer, and delivered to plaintiff by the Assistant District Engineer:
This is a notice of proposed adverse action. This notice is being given at least thirty days in advance of the effective date of the proposed action as required by Section 14 of the Veterans Preference Act of 1944.
*448 It is proposed to effect your removal from your position as Shovel Operator effective July 21,1952.
It is proposed to effect your removal for improper care of government equipment and operating in a careless manner, endangering the lives of other employees and the general traveling public. Following are the official charge and specifications:
Charge: Operation of heavy machinery in such a manner as to endanger other employees and the general traveling public.
Specification I: Careless handling of controls and endangering the lives of men working under the machine.
Specification II: Operating without attention to the lines, allowing extensive damage to boom and lines.
In connection with Specification I — On June 9,1952, Mr. Vernon F. Heilman was assisting in winding the cable drums by holding tension on the cable while you operated the frictions. Apparently unthinkingly you took the slack from all lines, while Mr. Heilman was still in the way and without any warning. The line struck his neck, and only through his own efforts to get out of the way of the moving line was he saved from severe injury.
Incident to Specification II — Inspection of the machine by Mr. O. B. Peterson, District Mechanic, disclosed that you have been operating with excessive slack in both the opening and closing lines. By carelessly allowing this slack line to drop from the guides and wrap around the boom pins, you succeeded in cutting one brace off the boom, cutting one boom section pin almost in two, one main channel almost off and weakening several other bracing members. Damage was so extensive that the machine was actually unsafe to operate, as any normally safe load would cause the boom to buckle. This damage was done over a period of days of careless and improper operation along a major highway where failure m the machine could result in injury to the general public.
You have the right to answer the charges in this letter personally or in writing and to furnish affidavits in support of your answer. Any answers to the charges must 'be received in this office within ten days from the receipt of this letter by you. _
_ Consideration will be given to your resignation if such is received in writing and before the effective date of the proposed separation action.
You will be carried in a duty status on those days you actually report for duty and work until the close of *449 business on July 21,1952, at which time your proposed removal becomes effective.
You will be officially advised relative to this proposed adverse action, at which time you will be given full and complete information regarding the appeal procedures available to you as an employee of the Alaska Road Commission and as a Civil Service employee entitled to Veterans Preference.
(b) On June 26,1952, plaintiff, as vice president of Lodge 183, AFGE, joined with the secretary of the union, in addressing the following letter[7] to the District Engineer:
Please be advised that the charges as outlined in your letter of June 18,1952, are not based on fact and that I deny each and every charge against me. It is my belief that the attempted disciplinary action was instigated in order to restrain, discourage, and coerce Alaska Road Commission employees from joining a labor organization, and as such violated the instructions to all agencies of the Department of the Interior, as outlined in the “Policy Memorandum”, promulgated by the Secretary of the Interior, and dated January 16,1948.
In accordance with American judicial practice, should you persist in your attempt to persecute me for my legitimate Union activities, I anticipate that I will be presumed to be innocent unless proven guilty (of the offenses charged) before an impartial body. Toward that end I request a formal hearing, before a judge or judges, not personally involved in the dispute, before whom you may attempt to substantiate your charges and I and/or my representatives may question or cross-examine your witnesses as well as to call witnesses and introduce evidence in my defense.
I further request to be notified of the hearing, sufficiently in advance to prepare a proper defense, but in no event less than five (5) working days.
(c) No hearing was scheduled or held by ARC in response to plaintiff’s request or otherwise. The next step in the proceeding was the following letter, dated July 1, 1952, from the District Engineer to plaintiff:
This letter is to advise you that you will be removed from your position as Shovel Operator and your em *450 ployment with, the Alaska Eoad Commission will be terminated at the close of business on July 21, 1952. You are being removed on the basis of the charge of operating heavy machinery in such a manner as to endanger other employees and the general traveling public. This charge was preferred in a written notice to you dated June 18,1952.
Your reply to this notice of June 18, 1952, under the date of June 26, 1952, has been carefully reviewed, but is not considered sufficient reason for not taking this removal action.
You may appeal this decision in writing directly to the Commissioner of Eoads, Alaska Eoad Commission, Juneau,.Alaska within ten days after the receipt of this notice.
You may also appeal this decision to the Eegional Director, Eleventh Civil Service Eegion, 802 Federal Building, Seattle 4, Washington, within ten days from the effective date of this action.
(d) On July 2, 1952, the following letter, signed by the secretary of the local and by plaintiff as vice president, was addressed to the Commissioner of Eoads, AEC, Juneau, and to the Eegional Director, Eleventh Civil Service Eegion, Seattle:
This letter is an appeal from the decision of Mr. E. J. White, District Engineer, * * * dated July 1,1952, regarding the proposed disciplinary action against Glenn L. Shadrick.
This appeal is based on the following facts:
(a) The charges against Mr. Shadrick are based on opinion and not on facts.
(b) That Mr. Shadrick is an employee of seven years service, all of which were as a heavy duty operator. That he has been requested repeatedly to operate equipment that required especially careful and experienced operational ability.
(c) Mr. Shadrick was given no opportunity to participate in the investigation, and further, when he attempted to secure statements of facts from fellow employees, he was told that Mr. Hatchet had pressurized and advised these employees against testifying in Mr. Shadrick’s behalf.
(d) Mr. Shadrick asked for a fair and impartial hearing which has in effect been denied him.
(e) That Mr. White and Mr. Hatchet are discriminating against Mr. Shadrick because of his union mem *451 bership and legal solicitation of memberships from fellow employees. The A.F.G.E. is prepared to introduce evidence to support the above statement. This evidence includes a statement made by Mr. White to one of the A.F.G.E. officers approximately a year ago that “Mr. Shadrick would be fired at the first opportunity.”
In view of the many irregularities by the Alaska Eoad Commission supervisors plus the years of faithful and reliable service by this employee, our recommendation is; first, that the whole proceeding against Mr. Shad-rick be dismissed, or (failing that course that) second, that a fair and impartial hearing be held in Anchorage.
* He * * *
18. Following is the reply of AEC to plaintiff’s appeal. The letter was dated July 14, 1952, and was signed by the Personnel Officer, who was stationed in Juneau.
Please refer to your letter of July 2,1952, appealing an adverse decision by the District Engineer, Alaska Eoad Commission, Anchorage, Alaska in proposing your separation for cause from the service of the Alaska Eoad Commission. This decision was communicated to you by letter dated July 1, 1952.
Civil Service Commission Eules, Eegulations, and Procedures governing appeals of preference eligibles under the Veterans Preference Act of 1944 are set forth in appropriate chapters of the Federal Personnel Manual. You are advised that pertinent provisions of the manual will be made available to you for study upon request at the District Office, Alaska Eoad Commission, Anchorage, Alaska.
After a very careful review of the charges made against you and your reply to these charges, you are advised that this office concurs with the decision of the District Engineer in recommending your dismissal. Appeals from adverse administrative decisions in cases covered by the Act must be directed to the appropriate office of the United States Civil Service Commission. In this case the appropriate office of the Civil Service Commission would be at Seattle, Washington. This should, where possible, be done within ten days of receipt by you of the adverse administrative decision. We wish to emphasize this point since your letter of July 2, does not indicate that your understanding was clear in this respect.
We appreciated receiving your views and comments in connection with this case, however, we regret that your *452 request for a bearing to be beld by tbe Alaska Eoad Commission cannot be granted.
If this office can be of further assistance, please do not hesitate to write.
19. (a) On July 21, 1952, plaintiff forwarded to the Director, Eleventh Eegion, Civil Service Commission, Seattle, the following detailed reply to the charges against him.
The charges brought against me by the Officials of the Alaska Eoad Commission are false. I have never at any time and especially while being employed by the A.E.C. operated any machine in a careless maimer, neither have I endangered the life of fellow workers or the general public.

In Connection with Specification No. 1

Mr. Vernon Heilman was struck on the neck by hoisting cable while assisting the installing of a new closing cable. At this time the engine was running at idling speed and I was watching Mr. Heilman’s hands so as not to catch his hands between cable and drum. This operation had been performed by us before when there had been too much slack in the closing cable. At all times extreme caution had been used by both him and myself.
This specification is mainly presumed by A.E.C. officials who actually do not understand this machine, other than the District Mechanic who had not previously inspected it before I started operating it.
In regards to the paragraph amplifying the charges in specification No. 1, it is correct that I was operating the frictions while Mr. Heilman was holding tension on the cable. The next two sentences are not correct because Mr. Heilman and I were winding only one line, the closing line on the drum.
The booster which governs the friction of the hoist line was grabbing at unexpected times taking the slack from the hoist line. It was this grabbing which caused the hoist line to strike Mr. Heilman on the neck. At this time in order to get away from the cable he dodged to the left, thus hitting his head on the side of the machine. This caused as much personal injury to Mr. Heilman as the cable. I was aware of this faulty operation or grabbing and therefore moved controls cautiously so as not to cause any fast moving of drums.
The work by Mr. Heilman and myself on the line referred to was necessitated by the faulty roller which *453 I had reported to the District Mechanic as in need of repair during my first week on this clam.
This roller had notches or grooves worn in it and the cable would pull tight in these notches. In order to get the clam bucket to open the brake governing the closing line would have to be released to get slack enough to allow the cable to loosen up out of the notch when caught. At times both the closing and hoisting lines would pull into the same notch, and to loosen would require extensive slack in lines, also causing damage to cables.
Had the District Mechanic repaired the roller as requested the accident to Mr. Heilman would not have occurred, nor would there have been any damage to cables or machines. No operator could have avoided the possibility of an accident with this machine in this condition, nor could warning be given as no operator could tell in advance when the lines would grab.
The District Mechanic who made the statement in regards to this machine was obviously prejudiced because he knew that this machine was not in good condition at the time I was asked to operate it.
I made complaints concerning needed repairs to District Mechanic during my first week on this machine, concerning wearing of cables by poor shop made roller, the incorrect boom position and a safety hazard regarding truck. I also made other suggestions for the improved operation of this machine, such as shortening the boom, which would have resulted in a safer operation.

In Connection with Specification II

At the time that I was asked by the general foreman to take the job of running the clam in question, I was running a shovel. I told the general foreman that I had never run a clam (although I had once about 10 years ago), and I turned him down on his request. A week later the general foreman returned and insisted that I take over operation of the clam because there was no better experienced operator available. I then accepted. My own opinion by past experience on other machines is that I did not cause any damage that would not have been caused by any man on faulty and unfamiliar equipment.
On this same machine the general foreman stated that he had had trouble before; such as losing cables *454 and getting too much slack in closing cable as line would cross over on hoisting drum. He also stated that the machine was rather hard to operate.
This clam was an old machine which had been subjected to considerable wear, especially last year at Gird-wood and again at the New overpass at the International Airport. The boom, before I began operating the machine, had been cut in at least two places; a guide had been cut almost off, and other general damage was evident.
Mr. James Lynch, shop welder who repaired this machine, reported to Mr. Wm. Cannon and myself that the damage was not extensive as stated in Spec. II. He stated he merely welded on two small angle irons and replaced one guide; that the whole repair job took less than thirty minutes of his time. In addition, the boom was changed to the correct position as originally requested and advised by myself.
For the past year, at least, I have consistently advocated a system of daily written work reports of machines conditions by the operators. This would result in better maintenance of machines with increased safety and the additional advantage of fixing responsibility for operational breakdowns and/or accidents
Such a system of reports would clearly have substantiated my early reports of safety hazards and repair needs on the clam in question.
I have worked for the A.B..C. since October 2, 1945 and have operated dozers, graders, pile driver, shovels and driven truck. The only machine I had not operated was the clam. In all of this time there had been no complaints about my work. In fact at least three foremen had asked me to take over the most difficult operations stating that they had more confidence in me than in the majority of the operators.
It is the concensus of opinion among the permanent men on the A.K..C. that no action would have been taken against me if I had taken no interest in the benefits offered by union organization. This opinion is supported by a statement made to me by Mr. Hatchett on June 18 when he personally delivered to me the original notice of proposed disciplinary action. Mr. Hatch-ett stated that he would not have initiated this action against me if I had not taken my original grievance to the Union. He referred to the fact that when I was removed from the clam and anticipated a reduction in wages, I protested my removal by requesting a hearing. I did this through the Union channels as *455 provided by tbe Secretary of the Interior’s Policy Memorandum on Labor Relations issued as instructions to heads of all Bureaus and offices of the Department of Interior on January 18, 1948 and which is still in effect.
In support of the above, I offer fifteen affidavits and/or additional statements. I also enclose a copy of memorandum, General Labor Relations Policy.
(b) The affidavits or statements mentioned in the last paragraph of the foregoing letter were duly enclosed with it. Some, if not all, of them are in evidence. They reflect the opinions of plaintiff’s fellow workers that he was not a careless operator, or one who abused the equipment entrusted to him, but always a careful, considerate, conscientious operator.
(c) On September 17,1952, the Regional Director of Civil Service at Seattle wrote the following letter to the District Engineer, ARC, at Anchorage, sending copies to the ARC Personnel Officer at Juneau and to plaintiff.
This office is giving consideration to an appeal filed under the provisions of Section 14 of the Veterans’ Preference Act of 1944 by Mr. Glenn L. Shadrick from your decision to remove him from the position of Shovel Operator effective at the close of business on July 21, 1952. In connection with this appeal the first indication this office has had that Mr. Shadrick may desire a hearing in the offices of the Eleventh United States Civil Service Region in Seattle, Washington is contained in a telegram, the contents of which have been made known to this office by Mr. Roy L. Peterson, National Vice President of the American Federation of Government Employees, who is located in Seattle, Washington. This telegram was sent by Mr. Phil Copson, President of Local 183 of the American Federation of Government Employees at Anchorage, Alaska. The contents of the telegram are as follows:
“Thru formal action we request that you protect our mutual interests in the forthcoming hearing for Shad-rick for Civil Service Commission, Seattle stop Advise if ARC will have an Anchorage representative If so we demand that Shadrick also be sent.”
Hearings in appeals considered under the provisions of Section 14 of the Veterans’ Preference Act are scheduled at the request of and for the benefit of appellants in order that they have an opportunity to present all pertinent and relevant material with respect to the specific *456 bases upon which adverse action has been predicated. 3n connection with such hearings the employing agency is invited to participate through such representation and witnesses as will make possible the presentation of the full facts in the case. Therefore, it is requested that this office be advised as to whether or not the agency desires to participate in any hearing which Mr. Shadrick may desire in Seattle, Washington through representation and witnesses. Mr. Shadrick may appear personally in a hearing, if he desires, or he may appear through or accompanied be :[sic] a representation of his own choice.
We are communicating with Mr. Shadrick to ascertain his desires with respect to a hearing at Seattle, and we are transmitting to you herewith a copy of our letter of even date to him. We are also furnishing to him a copy of this letter and we are likewise furnishing to Mr. Wallace C. Sharpies, Personnel Officer of the Alaska Road Commission at Juneau, Alaska copy of our letters to you and to Mr. Shadrick.
(d) On September 17,1952, the Regional Director of Civil Service at Seattle wrote the following letter to plaintiff, sending copies to the District Engineer, ARC, at Anchorage, and to the ARO Personnel Officer at Juneau.
Transmitted herewith is a copy of our letter of even date to Mr. E. J. White, District Engineer for the Alaska Road Commission at Anchorage, Alaska.
Review of results of investigation conducted by an Investigator from this office in July, 1952 and of material submitted prior thereto in connection with your appeal discloses a request for the scheduling of a hearing, in Seattle, Washington in your case. The first indication available to this office of your desire for a hearing in Seattle was transmitted to us by a telephone call from Mr. Roy L. Peterson, National Vice President of the American Federation of Government Employees. Our letter to the District Engineer of the Alaska Road Commission contains information concerning your right to a hearing through representation or through personal appearance at which time you may be represented by counsel of your own choice. We are transmitting to you for completion and return to this office copies of a form necessary for the designation of a representative.
Please advise this office if it is your desire to have a hearing in connection with your appeal, the hearing to be scheduled in the offices of the Eleventh United States Civil Service Region in Seattle, Washington.
*457 (e) In transmitting copies of the foregoing letters to the ARC Personnel Officer, the Regional Director of Civil Service asked to be advised:
*****
* * * as to whether or not Anchorage representation of the Alaska Road Commission would be sent to Seattle in connection with any prospective hearing or whether the agency desires to stand on the results of investigation conducted from this office.
(f) Following is plaintiff’s reply to the Regional Director of Civil Service. It was dated September 20,1952.
Received your letter of Sept. 18th regarding hearing.
It was my belief that the evidence gathered by investigation on July 21st and 22nd. adequate for a fair decision.
How ever If hearing is advised, please inform me that I may make necessary preparations.
It’s very important that a decision be reached in the near future. To date the period of two months have elapsed since action was taken against me by Alaska Road Commission officials.
During this time I worked one week for Contractors and have a family to support, so my reason for a quick decision should need no further explaining.
This decision is also an important matter to employees of the Alaska Road Commission. They believe that through petty cooked up deals they may be prosecuted in the same manner.
How ever I’m sure that when Mr. Peterson & Mr. Cannon met with you they discussed the main details of my case and our reasons for joining the A.F.G.E.
If a decision can be reached with out a hearing and further delay it would be gratefully appreciated by me, how ever I do not wish to cast aside any attempts that would be necessary to gain a decision in my favor.
20. (a) On October 1,1952, the Regional Director of Civil Service forwarded to the ARC Personnel Officer a copy of his decision on plaintiff’s appeal, together with the advice that:
*****
It has been found that procedural requirements of Section 14 of the Veterans’Preference Act of 1944 and of Regulations issued thereunder by the United States Civil Service Commission have been met in connection *458 with the action taken in this case. It has also been found that the bases for the adverse action constitute sufficient justification for that action, and it has been recommended that the action of removal stand as effected.
(b) Following is the pertinent part[8] of the text of the Regional Director’s decision.
APPEAL OP MR. GLENN L. SHADRICK UNDER SECTION 14 OP THE VETERANS’ PREPERENCE ACT OP 1944
On July 8,1952 there was received in the office of the Director, an appeal filed by Mr. Glenn L. Shadrick, 130 East 8th St., Anchorage, Alaska from the decision of the District Engineer, Alaska Eoad Commission, Anchorage, Alaska to remove him from the position of Grader Operator, effective July 21,1952.
AUTHORITY AND JURISDICTION OP THE COMMISSION
The authority for consideration of this appeal by the Commission will be found in Section 14 of the Veterans’ Preference Act of 1944.
RIGHT OP MR. SHADRICK TO APPEAL
It has been determined from evidence of Mr. Shad-rick’s being entitled to veteran preference and evidence of the extent of his service with the Department of the Interior that he is entitled to appeal under the provisions of Section 14 of the Veterans’ Preference Act of 1944 and of regulations issued thereunder by the United States Civil Service Commission.
EVIDENCE AND ANALYSIS
By letter dated June 18,1952 directed to the appellant by Mr. E. J. White, District Engineer of the Alaska Eoad Commission at Anchorage, Alaska Mr. Shadrick was notified that it was proposed to effect his removal from the position of Shovel Operator effective July 21, 1952 -because of improper care of Government equipment and operating that equipment in a careless manner, endangering the lives of other employees and the general traveling public. Charges were broken down into two *459 specifications which consisted of: Specification 1, careless handling of controls and endangering the lives of men working under the machines, and Specification II, operating without attention to the lines, allowing extensive damage to boom and lines. Each specification was presented in more detailed fashion as follows:
# * * * *
Mr. Shadriek was notified in the letter of charges of his opportunity to make reply, and he did reply to the letter of charges by letter dated June 26, 1952, directed to Mr. E. J. White, District Engineer of the Alaska Road Commission. The reply made by Mr. Shadriek is as follows:
* * * * Jft
_ By letter dated July 1,1952 the District Engineer notified the appellant of final decision to take adverse action, and the content of this notification is as follows:
* * * * #
Investigation has been conducted from the office of the Director, Eleventh United States Civil Service Region, and the results of this investigation discloses that the charges presented to the appellant by letter dated June 18, 1952 are true. Statements made by the appellant and by others interested in his case do not serve to impair the validity of the charges, although they do attempt to minimize the seriousness of the damage to equipment alleged in. Specification II and to minimize the seriousness of the line accident in Specification I. The statements made by the appellant and others interested in his behalf do not support his categorical denial of the truth or validity of the charges as contained in his reply to the letter of charges dated June 26, 1952.
There can be but one conclusion reached and that is that the charges had sufficient foundation to justify administrative disciplinary action, and in view of the results of the Commission’s investigation it appears that the decision to remove Mr. Shadriek from the service was justified.
FINDINGS AND RECOMMENDATION
The findings are that the procedural requirements of Section 14 of the Veterans’ Preference Act of 1944 and of the Regulations issued pursuant thereto have been made with respect to the decision to remove the appellant from the service. It has also been found that the basis for the adverse action are sufficient justification. *460 It is recommended, therefore, that the action taken upon the adverse decision stand as effected.
No further appeal from this decision will be entertained from either Mr. Glenn L. Shadrick or from the Department of the Interior unless it is submitted to the Commissioners, United States Civil Service Commission, Washington 25, D.C. within 7 days after the receipt of this decision. Notification of the further appeal should be given to this office in order that the file of the case may be transmitted to the Commissioners. Regulations provide that the Commissioners’ Board of Appeal and Review will review the record on the appellant and grant a hearing in its discretion. If a hearing is desired by the preference eligible or the agency, specific request for such hearing should be made at the time of •the further appeal, substantial reasons being stated for its necessity. Pertinent evidence and representation in writing should be submitted with the appeal to the Commissioners.
(c) On October 8, 1952, the president of Lodge 183, AFGE, addressed the following letter to the Civil Service Commission in Washington. The letter was attested by plaintiff. A copy was sent to the District Office, ARC, Anchorage.
We are appealing the decision of the Eleventh United States Civil Service Region relative to the dismissal of Glenn L. Shadrick by the Alaska Road Commission, Department of Interior.
Our reasons for the appeal are:
1. That Mr. Shadrick has never been a careless operator in his six and one-half years as an operator for the A.R.C., and complete evidence should so show.
2. Our original request for a hearing in Anchorage where the witnesses for the defense reside, and where cross-examination of witnesses would be possible, was not granted. This is especially important since a main witness, Mr. Yemon Hillman, made conflicting, contradictory statements.
3. The machine which Mr. Hatchett claimed was seriously damaged, but which was repaired in a half hour, was immediately afterwards moved to a distant point out of Anchorage to Glen Allen, by A.R.C. officials. The time allowed for preparation of defense, two days, was not sufficient to enable on-the-scene examination of the alleged damage, nor to secure depositions from eyewitnesses from the crew members using this machine at *461 Glen Allen. . Likewise, it was impossible, because of shortage of time, to secure evidence about the worn condition of this machine, its lines and booms, from the crews who used it in work at Girdwood and International Airport.
We are prepared to show that the condition of this machine was very poor, but that it was nevertheless put into operation on the job in question without any repairs. For this we need time to contact employees in Girdwood who knew the rough treatment to which this machine had been previously subjected, to prepare statements.
4. Opportunity to introduce, evidence that the A.E.C. had no consistent over-all policy for discipline of employees involved in loss of time damages. On the contrary, discipline was determined largely on the basis of the personal relationship between a foreman or supervisor and the employee. In the following incidents, involving greater damage than in the case of Mr. Shad-rick, no disciplinary action of any kind was taken:
(a). In the winter of 1950-1951, on an extremely cold morning, the operator of a boom truck started the motor and failed to check on the oil gauge. He then walked away, leaving the motor running with the throttle pulled out. Lack of proper checking caused the rods to be burned out, with a resultant loss of time and material in a major motor repair job. No discipline was levied.
(b) When overhauled, and before this truck was taken from the shop, a second serious damage was caused by apparent negligence. The operator overwound the cable on the winch to the extent that both safety chains were broken and the boom was bent. No disciplinary action was taken.
(c) In the late winter of 1950-1951 this same operator ran into railroad tracks at the Eklutna crossing with a Eeo snow plow truck. The truck and plow had to be completely rebuilt and while being repaired was tied up approximately two weeks at a time when this equipment was badly needed for snow removal.
(d) About two weeks later this same snow plow was damaged again when the operator ran into a rock. In neither this nor the previous incident was there any discipline.
(e) In the .Palmer area, at a time shortly after the incident previously described, the operator of a snow plow ran into railroad tracks causing considerable damage to the equipment, also injury to himself and loss of time. No disciplinary action was taken.
*462 (f) During the summer of 1951, about August, a truck operator turned over three dump trucks in a period of two weeks. Each accident was considered by fellow employees to involve operator negligence. Besides expensive material costs, each of these three incidents involved a time loss of several hours. This employee was related to the general foreman (contrary to Interior Department policy). He was not disciplined for this, and for other poor work habits.
(g) During the summer of 1950 a tractor operator was clearing a roadway in heavy timber. He requested that a safety device, in accordance with safety regulations, be installed over the top of the tractor. Mr. Bruhn, the foreman, refused this proper request, adding the threat that if a tree fell causing an injury, the operator would be fired.
About a year later this same foreman operated a tractor himself without the safety device. He was hit by a tree which broke several of his ribs.
The workman who originally requested that safety precautions be observed was struck on the side of the head from a falling limb.
We are certain that no action to discipline the foreman was even contemplated. None occurred.
The cases aibove are known personally to Mr. Shadrick and others, and by no means represent all of the recent damage cases where no discipline was levied.
We request that the decision of the Eleventh Region United States Civil Service Commission be reversed. If this cannot be done on the basis of the facts now available, we propose a hearing in Anchorage, Alaska, as the fairest and most practical method of securing additional evidence.
(d) On October 10,1952, the president of the local union addressed the following letter to Miss Frances Perkins, a member of the Civil Service Commission.
Our Lodge is appealing to you directly for your personal attention in the case of Glenn L. Shadrick, discharged 'by the Alaska Road Commission for alleged negligence causing machinery damage and time loss.
This is not a case of an individual employee of a governmental agency. It is a situation where the employees have every few years attempted to solve their problems through organization. A year and a half ago, unsettled grievances brought a group of men to our Executive Board. Our officers explained the advantages the organization had brought the Alaska Railroad workers, *463 and agreed to assist the Road Commission employees in a similar move. At the same time, committees interviewed the management of the Commission in an attempt to reconcile grievances. These committees were treated with open hostility.
At this time Mr. Shadrick was elected the spokesman for the Road Commission employees by one hundred men who had by then j oined our Lodge. He was later elected First Vice President of the Lodge.
After the elections, in January of 1952, we formally requested representation from the Anchorage District of the Alaska Road Commission. We repeated this request of Mr. A. F. Ghiglione, Commissioner of Roads for Alaska, on June 13, 1952, and verbally in a meeting with Mr. Ghiglione and local officials on June 22nd.
The notice of proposed disciplinary action against Mr. Shadrick bears the date of June 18,1952.
It is the confirmed judgment of each and every one of our Executive Board, and of the great majority of Alaska Road Commission workers, that the action against Mr. Shadrick is in actuality motivated by a desire on the part of the Commission officials to discourage unionization and to be rid of the leader of the men.
Should you have any doubt about the facts as we present them, we would welcome an impartial investigation which could go into all of the aspects of this case. The investigator for the Eleventh District U.S. Civil Service Commission stated that he was extremely limited in what he could go into, and that he definitely could not interest himself in the general problem of Union discrimination. He could not go into the very thing which was the key to the whole situation!
We will be frank to state that we are banking on your life of service to working people, and especially your hears [sic] as head of the Department of Labor, to assist us in securing just treatment for our Lodge in general, and for Mr. Shadrick in particular.
As you will notice, we have asked that the decision of the Eleventh Region be reversed.
21. (a) Beginning in August 1951, the local union persevered in its efforts to obtain recognition of the union by ARC as bargaining agent for the employees. The first formal request for recognition was, as heretofore noted, contained in a letter dated August 31,1951, from the secretary of Lodge 183, AFGE, to the Commissioner of Roads. The *464 labor relations adviser from the Washington office of the Alaska Railroad was then in Alaska surveying ARC labor relations and advising with ARC management and employees.
(b) On March 21,1952, the District Engineer gave to the president of the local a letter of introduction addressed to two general foremen and two foremen, requesting that the president of the union “* * * when visiting your area, be allowed to talk to the men during working hours,” the conversations to be with individuals, without holding mass meetings on Government time.
(c) On May 15,1952, the National President, AFGE, advised the secretary of Lodge 183 that he had been informed that “it would be necessary for the lodge to have a majority of the employees as members before * * * recognition could be accorded,” and that he believed “the Interior Department would consider recognition on the basis of a majority of the permanent employees of the Road Commission * * *.”
(d) On June 13, 1952, officers of the local (including the secretary, a former president who listed himself as organizer, and plaintiff as vice president) addressed a letter to the Commissioner of Roads expressing regret over the cancellation of a meeting that had been scheduled for the previous evening and requesting from him “an expression * * * regarding your readiness to enter into discussion with us, as representatives of definite groups of ARC employees, having in mind eventual mutually satisfactory working rules and wage classification.”
(e) On July 30, 1952, the president of the union wrote to the Commissioner of Roads:
❖ * ‡ * *
Please be advised that a majority of the permanent wage board employees of the Anchorage and Valdez Districts have formally designated the A.F.G.E. Local 183 as their bargaining agent. According to the Secretary of Interior’s Memorandum on Labor Policy a geographic subdivision is a logical unit for bargaining purposes. We request your conformation [sic] of Anchorage and Valdez as such units.
We propose that employees application to become a union member and/or authorization cards be the basis *465 for proving our contention that we do represent a majority of the employees of the two districts named. In order to be properly prepared it is necessary for us to have, for checking purposes, a list of the wage board employees, by job classification and district. Will you please send us such a list in the very near future?
An agreement will be necessary between us as to the cutoff date to be used for such representation determination. We propose March 1st, 1952 as a fair date.
* * if: * *
(f) On August 11, 1952, the Commissioner of Eoads replied:
* # Hi * *
In accordance with the Secretary of the Interior’s statement of labor policy for the Department, we shall be glad to accord your organization representation rights for wageboard employees on a showing of hands that the majority so desire.
We have given considerable thought to the designation of the appropriate 'bargaining unit for the Alaska Road Commission and we question the advisability of accepting the Anchorage and Valdez Districts as separate units for such purposes. The Alaska Road Commission does not consider it to be appropriate that representatives of its wageboard employees in a single District should, jointly with management, 'determine wage rates and collateral rules affecting compensation that are necessarily common to wageboard employees in all Districts. It is recognized that this unit designation for bargaining purposes is of vital importance to the activities of the American Federation of Government Employees, and further discussion with you on this matter appears to be desirable.
We believe that a specific authorization from each wageboard employee who desires your organization to represent him will constitute a firm and fair basis for demonstrating the extent to which wageboard employees desire representation. We assume that all Alaska Road Commission members of your Union would be willing to sign such authorization cards and that you have representatives in both the Anchorage and Valdez Districts who can secure such signatures.
The most difficult aspect of your request concerns the establishment of a list of Road Commission employees by name, job classification and District, whom you would agree to be eligible to sign authorization cards. For example, we would not regard it as fair for you to *466 represent certain wage board employees and, at tbe same time deny them a voice in expressing preference for such representation. This might be the result of your suggestion of a March 1, 1952 cutoif date. It is our own opinion that a determination as to the eligibility of the various classes of wageboard employees to participate in a showing of hands for representation purposes can best be made after a joint discussion between representatives of your organization and the Alaska Eoad Commission.
We suggest that a meeting to discuss the foregoing questions, and any others that may occur in connection with these matters, be held in Anchorage at such early date as is satisfactory to both parties.
(g) On September 23, 1952, the Commissioner of Eoads again wrote to the president of the local:
* * * It is my understanding that Mr. Wm. J. Niemi, Chief Engineer, Alaska Eoad Commission, met with you and other officers of the American Federation of Government Employees on September 6th and that he made several proposals to you which were to be taken under advisement and upon which we have been expecting further communication from you. In order that no misunderstanding should arise in this matter I will briefly review the points of discussion and suggestions made by Mr. Niemi for your consideration.
The designation of the appropriate bargaining unit for the Alaska Eoad Commission was discussed. In my letter of August 11, 1952, I stated that we questioned the advisability of accepting individual Districts as separate units for bargaining purposes. However, in your discussion with Mr. Niemi it was brought out that the issues for bargaining would not, in effect, be Eoad Commission-wide and that therefore consideration of a District as a bargaining unit was justified. Mr. Niemi requested that you submit a list, detailing items desired for bargaining purposes in order that we could properly judge whether a District could be considered a separate unit for such matters.
A further discussion considered the cutoff date for evaluating majority representation by the American Federation of Government Employees. Mr. Niemi proposed September 1st as being reasonable because it covered a period between maximum and minimum employment, and also because it was considered more appropriate than a historic date such as March 1st which was suggested by you. Mr. Niemi offered to furnish a *467 complete tabulation, of employees on the Alaska Eoad Commission rolls as of the 1st of September for evaluating representation. However, he advised that because of the considerable work involved in preparation of the list, he would require some agreement from you as to the acceptability of September 1st being the cutoff date. As soon as we receive your concurrence as to the cutoff date, we will be pleased to start the preparation of employee lists.
In the evaluation of representation of employees in order to judge majority concurrence by our employees, the Alaska Road Commission will accept signed authorization cards of the type you submitted to Mr. Niemi, together with membership cards showing paid-up membership in the Federation. I do not believe there was any difference of opinion on this subject.
* * * * *
(h) On October 10, 1952, the president of the local wrote to the National President of AFGE:
Since our last letter to you relative to the Alaska Road Commission our officers have been contacted twice by telephone by a member of Mr. E. J. White’s staff in an obvious attempt to badger us into accepting September 1, 1952, as the date for bargaining rights determination.
As we have pointed out before, last winter and early last spring before the seasonal upsurge in employment took place, the A.F.G.E. had a distinct majority of wage board employees in the Anchorage area. The A.R.C. officials want the September 1st date because that date represents the peak of seasonal employment. Soon the fall lay-offs will begin. By December 1st, only the year-around employees will be on the payroll. The September 1st figure would greatly inflate the number we would need to obtain a majority. A 100% majority of the year-round employees would be less than 50% of the September 1st peak. Is it fair for the 90-day or 120-day employees, most of whom do desire representation but are “here today and gone tomorrow” to be used against the permanent employees? It is the permanent worker who obviously must carry all of the responsibility for trying to secure the benefits of organization.
We have proposed November 1st as a date which meets the objection that Mr. Ghiglione had to our first proposal (March 1, 1952) that it was “historic”. The A.R.C. refused to consider any alternative to Septem *468 ber 1st. Further discussions have been made dependent upon our acceptance of their unfair and arbitrary-date.
It is our contention that a fair policy should be to the effect that at any time a labor organization had a substantial membership, and especially where no other organization was in the field, that, the A.E.C. stands ready to deal with that labor organization as representing the employees.
Frankly, we do not understand this resistance by officials of the A.E.C. to our endeavors to extend security and other rights of U.S. Government workers to the Alaska Eoad Commission.
It is our hope that you can secure a more lenient, genuinely friendly, and cooperative attitude, from Alaska Eoad Commission officials through Washington channels. * * *
* ❖ ❖ * ❖
22. (a) On January 23, 1953, the Eegional Director of Civil Service wrote to plaintiff:
By letter dated October 1,1952 this office transmitted to you a decision in connection with your appeal from the decision of the District Engineer, Alaska Eoad Commission, to remove you from your position of Grader Operator. Subsequently you appealed to the Commissioners, United .States Civil Service Commission, and now it has been requested that you be afforded a personal hearing in order that there may be developed all pertinent facts in connection with your appeal. To this end this office proposes to schedule personal hearing at which you may have present such representation and witnesses as you consider necessary to the developing of all the facts.
We have requested the Postmaster at Anchorage, Alaska to give his assistance in arranging for an appropriate room for the proposed hearing. A representative of this office, Mr. Wayne E. Salisbury, will arrive in Anchorage on Northwestern Airlines Flight 821 on Tuesday, February 10, 1953. He will open the hearing at 9:00 a.m. on the morning of Wednesday February 11, 1953 in the quarters arranged by the Postmaster. In connection with these proceedings you may have present such representation and witnesses as you consider necessary to the developing of all facts in your case. You should advise the District Engineer of the Alaska Eoad Commission at Anchorage, Alaska of the names of any present employees of that agency *469 whom you desire to have made available as witnesses in your behalf. Any witnesses you desire who are not now employed by the Alaska Eoad Commission you will have to contact and have present, making such arrangements as are necessary yourself.
The hearing in your case will continue from 9:00 a.m. on February 11, 1953 until all pertinent and relevant material has been received by the Hearing Examiner.
*****
(b) The hearing was held in Anchorage on February 10, 1953, by a Civil Service hearing examiner. Plaintiff was present and was represented by an attorney. Union officials attending the hearing included the president, a former president, and the secretary. Twelve witnesses were heard, of whom five testified in plaintiff’s behalf. Plaintiff also testified. The seven witnesses testifying for management included the District Engineer,[9] the Assistant District Engineer,[10] two district mechanics,[11] the general foreman,[12] and the foreman[13] in charge at the time of the Heilman accident and Heilman himself.
(c) Plaintiff appeared at the hearing with a reporter to record the proceedings. The hearing examiner, in conformity with subsisting regulations, refused to proceed until the reporter had withdrawn. The examiner did not provide a reporter, but made notes from which he later prepared a summary.
(d) The evidence is unsatisfactory as to whether or not the witnesses were sworn. It does not warrant a finding either way.
(e) Some cross-examination of plaintiff’s witnesses by the Assistant District Engineer was permitted by the hearing examiner. Neither plaintiff nor his attorney appears to have pressed for the right to cross-examine management’s witnesses.
23. Sometime after the hearing the examiner prepared a summary of the proceedings. He listed the date and place of hearing, the appearance of plaintiff, his counsel and *470 (union) representatives, and tbe names of the witnesses. The summary opened with a reference to the letter of charges of June 18, 1952, and a recitation of the charge specifications. The remainder of the summary follows verbatim.[14]
‡ ‡ $
Records disclosed that the appellant was first appointed by the Alaska Koad Commission on October 2, 1945. He was placed on annual leave on September 20, 1951 because of budget difficulties, returned to active duty on November 5, 1951, and his services have been continuous until he was removed on July 21,1952.
Mr. Eugene J. White became District Engineer of the Alaska Koad Commission at Anchorage on January 19, 1951 and has continued in that position to the present time. His predecessor was Mr. Thor Kivenes.
Mr. Shadrick testified that the machine involved in the charges was a clam shovel, (Byers, Serial Number 83CC-2, according to records of Alaska Koad Commission), which was two or three years old and was in poor shape when he took it over. He stated that he operated this machine approximately two and one-half weeks. The appellant stated that on about the first day of his operation of the machine he reported to Mr. Van Zanten and Mr. Bruhn and two or three days later to Mr. Peterson the poor condition of a “homemade” shiv or roller some sixteen to eighteen inches long which protected the top of the cab, under which roller two lines ran to drums in the cab. There were two drums side by side, one for a hoisting line, the other for the closing line. Appellant stated he was operating with the boom probably at a 75 to 80 degree angle, and that the lines did contact the shiv or roller which had been placed to protect the framework of the cab. He stated that this roller was about 2% to 3 inches in diameter and was deeply notched or grooved from wear. Sometimes, he stated, both the hoisting and closing lines would pull into the same notches on this roller, and when this happened they would hang so that the bucket would not open.
Mr. Shadrick stated that when he reported the condition of this roller, Mr. Peterson said he would look at it, but nothing was done. He said he had also re *471 ported a gas tank which, had a hot muffler running its full length. He testified he also asked that a section of the boom, which was about 37 feet long, be removed. Nothing was done about shortening the boom.
Mr. Peterson stated at this point that the boom would have been either 40 or 50 feet in length because it consisted of three sections, a tip of fifteen feet, a tail of fifteen feet, and a center of either ten or twenty feet.
Mr. Shadrick stated that on June 9, 1952, at the time of injury to Mr. Heilman, the two were winding a new closing cable on the drum. Appellant was operating the machine and handling the frictions. Mr. Heilman was standing in front of the drum, stooping over while feeding the cable and holding tension on it. Clutches operated by hand controlled drum friction clutches, and the friction clutch on the hoisting drum was grabbing some so as to twitch the slack hoisting cable. The friction clutch levers were close together to enable an operator to operate both with one hand. Appellant stated that Mr. Heilman knew the hoisting drum friction clutch was grabbing at times. He stated that his hand did not slip so as to cause the accident, that he was operating only the friction on the closing drum. The boom was lowered until the tip was resting on the bucket.
Mr. Shadrick stated that he did not actually see the accident in which Mr. Heilman was injured because he was intent on his operating the friction clutch. He said the hoisting lines struck Heilman on the right side of the neck, and that Heilman, in jerking his head, struck it against the side of the machine, breaking the skin beside the left eye. He said, the hoisting line did not break the skin on the right side of Heilman’s neck, and he did not think the cable would have hurt the neck any more if Heilman had not jerked his head. This accident happened at about ten o’clock in the morning, just after the machine was started up. Appellant stated that a foot or eighteen inches of slack was all that would be necessary to cause the accident.
Mr. Shadrick stated that he sent Mr. Heilman into Anchorage, a 'distance of about twenty-four miles, to have his eye checked. At that time, according to Mr. Shadrick, Mr. Heilman said the accident wasn’t the appellant’s fault and he didn’t think it was necessary to go into town. The appellant stated that Mr. Heil-man worked on the day following the accident, but did not work the second day after it. On this second day appellant picked Mr. Heilman and Earl King up on *472 the way to the Boad Commission shops and Heilman said he was not feeling much like working. Mr. Shad-rick stated that he told Heilman he might as well take some sick leave, and the latter said he had other things he would like to do, that he would like to find a house to live in. Mr. Heilman then took two or three days off, said Mr. Shadrick, and later came back to work with the appellant on the same machine. They changed machines about the time Mr. Heilman returned from leave.
Mr. Shadrick stated at the time of Mr. Heilman’s injury he did not make any particular check of the Byers Clamshell to determine how much wear or damage there was on it. He used this machine for three or four more days, and then it began to develop some engine trouble. Mr. Yan Zanten and a mechanic came out to check the machine which the appellant took into the Boad Commission shops for repairs on the following day after bringing out a new Lorraine in the morning.
Mr. Shadrick stated that, at the time he took the Byers clamshell into the shops, there were some scars on the boom which were worn while he operated it. He stated that he wanted pointed out by Boad Commission officials the brace he was supposed to have cut off. He stated that the head of a boom pin was the only part of the boom a loose line could have struck. He further stated that any person getting work done with this type of machine would have some slack line wear on the boom. If a person were careful enough to keep tension on the lines all the time, he might not have a line wear, but he would not get much work done, according to the appellant.
Mr. Peterson testified that the boom on the Byers clamshell was not shortened when the machine was brought in for repairs. He stated that the appellant operated with the boom at too acute an angle, but that he would not have been operating at a 75 or 80 degree angle as appellant testified.
Mr. Hatchett testified that the motor of the Byers machine had begun “acting up” at the time the machine was brought in for repairs. Mr. Whitmarsh, mechanic, was sent out to look at the machine, and when he returned he advised Mr. Hatchett that damage to the boom was so extensive the machine would have to be brought into the shops because it was unsafe to operate. It was then the Lorraine was sent out. Mr. Shadrick operated the Lorraine one day and was then assigned to operate a grader on the farm roads around town.
*473 Mr. Hatchett stated that the Byers machine is equipped with a foot brake for each drum, making it possible to lock either drum to prevent any motion in the line due to grabbing of the frictions. If, at the time of injury to Mr. Heilman, the frictions were grabbing on the hoist line drum, it could have been locked to prevent any movement.
Mr. Peterson pointed out that the roller shiv for the protection of the cab was above the hoisting and closing lines; that the lines could not have touched this shiv unless the machine were being operated with the boom raised to an unnecessarily acute angle; and that grooves in this roller could not have caused excessive slack in the hoisting or closing lines from the drums to the boom tip. This witness diagramed the boom brace, a two inch pipe welded to the midsection of the boom and extending out from the boom section for eighteen inches or more. This boom brace was cut clear off, according to the witness, by action of slack line so loose so as [to] swing clear under the brace and sawing upward. He stated that one boom pin, a pin used to fasten one of four comers of two boom sections together, was cut off by slack line so that a cotter pin had dropped out and the cotter pin hole was worn through until there was very little boom pin body left to hold the boom joints together on this corner.
Mr. Peterson stated that there was no periodic inspection of machines, and that he had not operated the Byers Clamshell just before Mr. Shadrick was assigned to it. In repairing the machine Mr. Peterson stated it was necessary to make and install a new boom pin, weld on the boom brace which had been cut off, and weld on angle iron to cover a boom member which had been seriously weakened by slack line wear near the boom tip.
Mr. Bert Bruhn testified that he had operated the Byers shovel with a dragline attachment at 10th and Gamble in Anchorage just a few days before it was put on the frost-boil job on which the appellant was the first operator, at 10th and Gamble, said the witness, he had high tension electric lines to contend with so that he had to boom down to get under the wires and boom up as he was turning sideways to get out with dirt. He stated that the machine was then in safe operating condition, although he did not make detailed examination to see whether all boom pins were intact or as to whether the boom sway brace were cut or how badly it was cut, if at all.
*474 Mr. Shadrick stated that when, he turned the Byers machine in for repairs he was not aware of a boom pin’s being almost cut in two, nor did he know of a brace cut clear off. He stated that when he took over the machine there was a “guide” almost cut off a pipe welded on the boom frame, tip section. This pipe, he stated, was almost cut off when he took the machine and he cut it the rest of the way off. He said there was very little holding this “guide” at the time he took a machine.
The appellant stated that when he was operating the Byers machine he managed to keep flags and warning signs in front of and to the rear of his machine to warn traffic. He stated that the Road Commission did not have a flagman on the job and that, although he could see traffic coming toward him from the front of his cab, he could not see traffic coming from behind him. He stated his belief that if his superiors were interested in the safety of the general public, they would have provided a flagman.
Mr. Shadrick stated that he did not know who had operated the Byers machine before he took it over, but that he reported the condition of the machine to the General Mechanic at the time he was assigned to operate it.
Mr. Hatchett stated that the roller shiv placed to protect the cab top from line wear was made in the Road Commission shop.
Mr. Carl Hancock stated that he worked with the appellant part of 1947, 1948 and 1949 and that he, himself, had been an operator of heavy equipment since 1939. He stated that he considered Mr. Shadrick one of the best operators in caution and care of machinery. At one time, according to the witness, a taxicab had run into a grader the appellant was operating but that no blame was attached to Mr. Shadrick. The witness stated that Mr. Shadrick seemed to be held in high regard until 1951 when Mr. Hancock said his wife ttfld him Shadrick was going to be let out.
Mrs. Alice Hancock stated that she worked for the Alaska Road Commission as Timekeeper at Kenai. She testified that Ralph Soberg was in the office at Kenai in July or the first of August 1951. Mr. Soberg was a General Foreman and he mentioned a number of the ARC employees in Anchorage. The witness stated that she made the remark to Mr. Soberg that the only one that she knew was Mickey Shadrick, and *475 Mr. Soberg stated that Shadrick was on his way out too because he was a disturber.
Mr. Wackrow testified that he had worked with Mr. Shadrick off and on since about 1948, and had never known of any charge of negligence against the appellant except the instant case. He stated he had always thought Mr. Shadrick was a good operator.
Mr. McDade testified that he worked with Mr. Shad-rick as operator of equipment. He stated he considered Mr. Shadrick as good as or better than the average equipment operator hired by the Alaska Road Commission. The witness stated he did not know of the appellant’s being involved in any other accidents and he considered Mr. Shadrick to be very particular about the care of his equipment.
On crossquestioning of Mr. Hancock by Mr. Hatch-ett, the former stated he had seen Mr. Shadrick operate a shovel although he was not working with the appellant at the time. The witness stated that the appellant was working on the highway and witness stopped to talk while on his way from Anchorage to Kenai.
Mr. Pinkerton stated that he has worked around Mr. Shadrick several years and considered him a good “blade” operator. Pie stated that he had hauled a few loads from under a shovel the appellant was operating, but that was about all he knew of Mr. Shadrick’s operation of shovels.
Mr. Edgar Russell, Senior Claims Clerk, Alaska Railroad, stated that he is a member of the American Federation of Government Employees who was appointed in 1951 by Mr. William H. Cannon to advise Alaska Road Commission employees who were trying to organize. He stated that he felt that union members were being discriminated against in the fall lay-off in 1951. In a call to Mr. White, the witness stated, the District Engineer of the Alaska Road Commission spoke to the witness about union activities and called Mr. Shadrick a trouble maker. The witness stated he called Mr. White to tell him that ARC employees in the AFGE were complaining about discrimination, and he wanted to warn Mr. White.
Mr. Hatchett stated that the charges against the appellant had nothing whatsoever to do with union activities.
Mr. Vernon G. Heilman who was injured while working with the appellant on the Byers Clamshell, stated that he did not return to work on the day following the injury. He stated that he did not recall telling Mr. *476 McDade that the accident wasn’t anybody’s fault. He stated that he did not recall telling Mr. Cannon anything about the accident.
Mr. Heilman stated that he was feeding a new closing line to the drum on the Byers machine when he was hit by the other cable on the left side of his head. _ In that he was standing on the left side of the boom facing the drum, the hoisting cable would have had to whip clear over his head to strike him on the left side of his head. The witness stated he did not know how he cut his face over his left eye, whether he hit the boom when he turned or struck when he fell from the machine. He stated that he had several heat treatments to relieve the stiffness and soreness.
At the time of the accident, Mr. Heilman stated he had no conversation with Mr. Shadrick about it, so far as he could remember. The witness said he decided to So into town after he was hurt, got into a Alaska Boad iommission truck and drove in by himself, a distance of about twenty-three and a half miles. He stated he stopped on the way at a black-top plant and stayed for about an hour and a half because he had such a severe headache that he could not keep going. He stated the skin was broken over his left eye but that the pain was most severe on the left rear of his neck. He stated he was leaning over feeding the line to the drum and did not see the cable which struck him. The lines are steel cables one-half or three-quarter inches in diameter.
Becords show that Mr. Heilman was off work on June 10,11,12 and 13,1952 for physiotherapy.
Mr. McDade testified that he was working with Mr. Heilman at Eklutna Bridge when the two were discussing the accident to Mr. Heilman. He stated that Mr. Heilman then said he did not blame “Mickey”’ Shad-rick, that it was an accident that could happen to anyone.
Mr. William H. Cannon stated that he made some investigation after the accident in which Mr. Heilman was injured, within a week or so. He stated he and Mr. Shadrick were riding together in the latter’s car when they decided to go see Mr. Heilman. Mr. Shad-rick went up to Mr. Heilman’s apartment to invite him to come down to meet this witness. Mr. Heilman and his wife, according to the witness, came down and sat in the back seat of Mr. Shadrick’s car. The witness stated that Mr. Heilman said he had a headache similar to one you would have with a cold. Mr. Cannon stated that he *477 tried to locate the Byers machine to examine it, but was unable to do so.
Mr. Cannon stated that he had considerable experience in repairing machinery, and that he was of the opinion that the damage to the Byers machine charged against Shadrick was natural wear and tear to be expected in operation. He stated that he gained the impression at first that Mr. White did not want to have anything to do with the union, but stated that he and Mr. White did get together after several meetings. He stated that in his investigation of Mr. Shadrick’s case he had come to the conclusion that the appellant was being discriminated against because of his union activities. He stated that he had talked with Mr. Hatchett about the boom on the Byers machine and about Mr. Shadrick. In his conversation with Mr. Hatchett the witness stated that Mr. Hatchett did not seem to like Mr. Shadrick’s being a representative of the union.
Mr. Cannon stated that there was a “lay-off” by the Alaska Road Commission in September 1951 and Mr. Shadrick was laid off for the first time in five or six years while the men newer on the job were retained.
Mr. Shadrick stated in connection with this “lay-off” in 1951 a Mr. Pinkerton was kept on and other mei) with less service were called back before the appellant. Younger men were retained in the shop. Albert Perrin was working on an overhead on the International Airport Road while the appellant was laid off. The authorities at the Alaska Road Commission broke in a new shovel operator, Milton Brandon, who had been hired as a “dozer” operator. Mr. Shadrick stated that he was off work from September 20 to November 5,1951.
Mr. White stated that about August 1, 1951 his office received notice that maintenance funds for his district were cut in half. He found that he could maintain only a skeleton force on the job. Brandon had been with his organization one day longer than Shadrick and the latter had the greater accumulation of annual leave. For these reasons Brandon was retained in work status and Shadrick was placed on leave with pay status. Shad-rick was put back to work when Anchorage District received $65,000 by transfer of funds from other districts.
Mr. Hatchett stated that Pinkerton had been kept on the rolls in work status as a truck driver in the late summer and fall of 1951.
The appellant stated that in the summer of 1951 a truck driver named Gordon, who was related to Mr. Bruhn, overturned three dump trucks in a period of *478 two weeks. He stated that no disciplinary action had been taken against this driver.
The foregoing testimony of the appellant was presented to show that the action taken against the appellant was discriminatory and was presented after Mr. Bruhn had been excused from the hearing room.
Mr. Bruhn was contacted on the morning of February 11, 1953 for his account of circumstances presented by Mr. Shadrick. Mr. Bruhn stated that no relative of his had been employed under his supervision in 1951 and that it was contrary to the policy of Alaska Road Commission for relatives of supervisors to be employed where there could be supervisor-employee relationship between them. He stated that he remembered one dump truck driver who had buried the rear wheel of his truck three times while working on International Airport Road. These accidents, he stated, were not due to faulty driving, but to the soil condition where they occurred. The witness stated that on one of the three occasions the truck was damaged when the witness pulled it out of the mud to solid ground. These accidents were expected in the normal operation and were not considered bases for penalty actions.
Mr. Cannon related an occurrence in the summer of 1950 when an employee named Waldo Fox was injured by a falling limb while operating a “cat” in timber. He stated that this injury occurred because of failure of the employing agency to provide a safety canopy for the equipment. The witness stated that when Mr. Fox asked for the safety device, he was told he could operate the equipment as it was or he could quit. Mr. Cannon related the above to show that the Alaska Road Commission officials themselves were negligent in safety matters although they placed great stress on safety for the general public in the case of the appellant.
Mr. Hatchett testified that although canopy equipment for “cats” working in timber is a standard safety device, such was not available at the time. Mr. Fox requested it. He stated there was no such equipment on “cats” at the present time but that this safety equipment was to be built in the A.R.C. shops for installation on every “cat” operating in timber before the next work season.
Mr. Gregory testified that in the fall of 1952 he was driving down to Kenai when he saw two trucks at a bridge. One of the trucks he had to “ditch” when the two were meeting at the bridge. One was loaded, and the other which was empty had “ditched.” They were *479 ARC trucks and the drivers were Sholin and Rountree. Several men were gathered there discussing the accident. The story told was that one of the drivers had been in the ARC shops and had asked for brake repairs a couple of days previously. This driver had been told, according to the discussion, that he had the heaviest rig and that other drivers could look out for themselves.
Mr. Peterson testified that he was at the scene of the “ditching” accident that day. The next day one of the two drivers was reported by his foreman because he said he thought he could beat the other man across the bridge.
Mr. Hatchett and Mr. White stated that no report on this “ditching” incident had come to their attention on which to take disciplinary action.
24. (a) On May 18, 1953, the Regional Director of Civil Service wrote to plaintiff:
On April 1, 1953 there was transmitted to Mr. Earl Gregory of Seward, Alaska, a copy of a summary prepared in this office of the hearing which was accorded to you at Anchorage, Alaska on February 11, 1953 in connection with your appeal from the decision of the Alaska Road Commission to remove you from the service. In connection with the transmittal of this summary to Mr. Gregory it was requested that he review the document, make any corrections or additions which he felt were necessary to assure accuracy, and return to this office a copy of the corrections found necessary. As yet there has been received in this office no response to our request.
Because of the fact that Mr. Gregory, the attorney whom you retained as counsel for the hearing, is located at some distance from Anchorage, Alaska, I have delayed action in your case in order to allow full opportunity for consultation between you. I consider it no longer necessary to await the return of corrections to the summary prepared on the hearing.
I have reviewed the complete record in your case, including your testimony and representations in support of your appeal. Giving due attention to all the circumstances and conditions set forth in mitigation of the charges, I find from the record that the deficiencies alleged in support of your removal are fully substantiated and constitute a reasonable and just cause for the adverse action taken. I find also that they were matters within your control and responsibility in connection with your assignment to operate a clamshell. Upon *480 the basis of the record I find no canse to modify my decision which was transmitted to you by letter dated October 1, 1952, file WES :djf. I am, therefore, reaffirming that decision and returning your file to the Board of Appeals and Review, U.S. Civil Service Commission, Washington, D.C., for further review.
Any further representations you desire to make should be directed to the address given in the preceding paragraph.
(b) On May 25, 1953, by letter to the Board of Appeals and Review of the Civil Service Commission, Washington, plaintiff appealed “the adverse decision of the Eleventh Civil Service Region,” and designated as his representative “the American Federation of Government Employees in Washington, D.C.” Receipt of the appeal was acknowledged on June 17, 1953, by the Chairman of the Board of Appeals and Review.
(c) On September 8, 1953, the Chairman of the Board of Appeals and Review of the Civil Service Commission wrote the following letter to the Personnel Officer, ARC, at Juneau, supplying copies to plaintiff, union officials, and ARC officials.
Reference is made to the Section 14, Veterans’ Preference Act appeal of Mr. Glenn L. Shadrick from the decision of the Eleventh Regional Office in sustaining the action of the Alaska Road Commission in removing him from the position of Grader Operator on charges.
After careful consideration of all the evidence developed in connection with the case, including a copy of the summary of the hearing conducted by the Eleventh Regional Office on February 10, 1953, it has been determined that the removal action was not justified. In arriving at the decision it was concluded that the charges are not sustained by the evidence. Consequently, the Regional Office decision is reversed and it is recommended that Mr. Shadrick be restored retroactively to the day following the effective date of his removal.
Under the provisions of Public Law 325, approved August 4, 1947, and Section 14 of the Veterans’ Preference Act of 1944, the findings of the Commission are mandatory and the administrative officer concerned at the Alaska Road Commission shall take the corrective action recommended. This letter constitutes authority for the restoration of Mr. Shadrick in accordance *481 with the recommendation. Please advise the Commission of the action taken within ten (10) days after receipt of this letter.
(d) Plaintiff was not restored to duty by AEC. On September 18, 1958, the Commissioner of Eoads telegraphed the Chairman of the Board of Appeals and Review:
Please refer your letter September 8 received today * * * Respectfully request permission to appeal decision mandatory restoration * * * We are confident that discharge was warranted and can be sustained by amplification and clarification of evidence already submitted in the case and appeal is now being prepared.
25. (a) On October 1, 1953, the Commissioner of Roads, ARC, addressed the following letter to the Chairman of the Board of Appeals and Review of the Civil Service Commission.
Please refer to your letter of September 8,1953 * * * which directs the retroactive restoration of Mr. Glen L. Shadrick to the position of Shovel Operator, from which he was removed for cause as of July 21, 1952. Your letter was received at our office on September 18, 1953. _
_ It is noted that the Board of Appeals and Review has determined that the removal action was not justified since the evidence produced has failed to sustain the charges. The purpose of the Alaska Road Commission in instituting this appeal is to provide the Board with additional pertinent facts which we believe will fully sustain the charges brought against the employee at the time of his separation.
The specific charge on which the employee was dismissed was the operation of heavy equipment in a careless and negligent manner, injuring a fellow employee, and causing unnecessary and extensive damage to the machine. This occurred during a maintenance job being accomplished by a small crew on the Glenn Highway near Eklutna, about 24 miles from Anchorage. In reviewing the evidence which was developed in support of the charge of negligence against the operator in this case, we have found that there have been omissions of factual information and lack of development of some of the evidence that was produced both in the written charges and the hearings.
For example, in connection with the injury of the employee who was assisting the operator replace a dam *482 aged closing cable on one of the _ machine’s double drums, it is certain that the idle hoisting cable would not have struck the helper if the operator, who was working the frictions at the time, had taken the elementary precaution of locking the idle hoisting drum. This should have been effected by engaging the foot brake dog, a mechanical feature installed for that purpose. This was not done. Mr. Shadrick stated at the hearing that the friction clutch on the hoisting drum was “grabbing some” and that the helper knew this. This is entirely irrelevant and certainly is no excuse for the accident. On the contrary, it is an additional urgent reason for the operator to have locked that drum out of operation.
The seriousness of this operating negligence should not be minimized. The fact that the helper escaped with only minor injury was simply his good fortune. The operator had carelessly created a situation which could have resulted in a broken neck or the decapitation of a fellow employee. It is significant that this operator was not a novice at the job of operating a power shovel of the type which was in use at the time of this accident. The only reference made in the hearing to this item was made by the operator when he stated that he had operated this machine approximately two and one-half weeks. It is quite possible that this statement is accurate; however, over a period of many months, he had operated other makes of machines which operate on precisely the same principle, the two-drum type with hoisting and closing cables. We stress this point to emphasize the fact that his negligence in causing an accident could not be excused by inexperience or unfamiliarity with the proper techniques of operation. On numerous occasions prior to this accident supervisors cautioned this operator concerning his recklessness and inattention to duty.
Another matter which was not fully covered by the written charges or by verbal testimony at the hearing concerns the damage to the equipment. With respect to this item, the original charges stated, “* * * you have been operating with excessive slack in both the opening and closing lines. By carelessly allowing this slack line to drop from the guides and wrap around the boom pins, you succeeded in cutting one brace off the boom, cutting one boom section pin almost off and weakening several other bracing members. Damage was so extensive that the machine was actually unsafe to operate * *
*483 It is significant that the operator, in his testimony during the hearing, did not deny responsibility for such damages. In fact, he admitted during his testimony that he did operate with slack lines, and he further stated, “* * * any person getting work done with this type of machine would have some slack line wear on the boom. If a person were careful enough to keep tension on the lines all the time, he might not have a line wear, but he would not get much work done * * *.” This statement is true to the extent that normal scarring of the boom would not be unusual; however, it is not a satisfactory explanation of the extensive damage suffered by the machine. The only reply the operator made with direct reference to the charge of this damage was that he was not aware it existed. The damage was not existent at the time Mr. Shadrick took over the machine. It did exist when the machine was taken from him. It occurred only by operating with excessive slack in the lines, allowing them to whip over the boom sway brace and work under load in that position.
It is apparent, upon reviewing the testimony of the operator in the Summary of Hearing, that he began his testimony by dwelling on a diversionary topic. No reference was made in the original charges to the condition of the shiv or roller which protects the cab. That this roller was excessively worn, or the cause of such wearing, had not the slightest bearing on the points in question. This is merely a feature to protect the cab when the boom is operated at an unusually acute angle. Nor did the length of the boom have any bearing on the matter. The condition of the motor was irrelevant. None of these conditions had anything to do with the operational fault which caused the damage. Excessive slackness of lines is unnecessary, undesirable, and is avoidable, regardless of length of boom, type of shovel or condition of the motor. This operator was an habitual “slack-line” operator. _On numerous occasions he had been warned of this particular fault, and had been relieved of the controls a number of times in order to have demonstrated to him how to operate properly and avoid excessive slack. Irrespective of this assistance the operator continued to permit the cables to slap the boom so sharply that even prior to viewing the machine the foreman could identify the operator as Mr. Shadrick by the sound of the cable slap.
That Mr. Shadrick is a careless and unsafe operator is evidenced by the accident suffered by Vernon Heil- *484 man. This accident was a direct result of Mr. Shad-rick’s carelessness. A long time before this particular accident when Mr. Heilman began hauling from Mr. Shadrick’s rig, Mr. Heilman had informed his foreman that he was apprehensive of Mr. Shadrick’s operating ability. The foot brake on the idle hoisting drum was not locked at the time of the accident to Mr. Heil-man. This, in itself, indicates that Mr. Shadrick is an erratic operator and is unstable, unsteady, and careless in his attention to the controls of the machine.
Mr. Harry White, a long-time and trusted employee of the Alaska Road Commission, who during the early stages of Mr. Shadrick’s employment was District Mechanic at our Anchorage installation, observed that Mr. Shadrick, while assigned as a motor-grader operator, was both abusive and reckless in operating heavy equipment. At that time the Alaska Road Commission had two machines of the same make in the area — the same model with consecutive serious [sic] numbers— doing precisely the same kind of work, one machine following the other during blading of the road surface. This operator was continually having difficulty with the gear shifting mechanism. This difficulty was caused by shifting while the machine was in motion, or shifting while the power clutch was not yet completely disengaged. This practice of forcing the controls resulted in damage to the transmission, which damage was so extensive that shop maintenance and repair was frequently necessary. Two major transmission overhauls were necessary during a single year and were obviously a result of faulty operation. The other machine under the control of a competent operator required no major overhaul during the season. Mr. Shadrick was repeatedly cautioned by supervisors as to proper operating techniques and many demonstrations on the job were made for his benefit. After the second major overhaul became necessary the District Engineer advised the operator that any further carelessness would not be tolerated. Subsequent to this ultimatum he operated for about a year with a minimum of trouble. After this he was assigned to other motor graders of various makes and sizes, but periodically required cautioning by supervisors because of his careless manner of operating.
In the fall of 1951 during surfacing operations on the Abbott Loop Road this operator was unloading a power shovel from a lowboy by means of a loose gravel ramp. While on the loose gravel and in turning the *485 machine the tracks became filled with gravel. The normal course of action by a competent operator in correcting a situation of this kind would have involved working the machine carefully back and forth to clear the gravel from its tracks. However, in this case the operator characteristically lost his temper, jamming the controls into contact, forcing the machine into motion. This resulted in tearing out the travel gear or transmission. The approximate cost to the Government for repairing the machine was estimated at $500 to $600. In addition to this cost, a full crew, together with its equipment, was delayed for approximately a half day until another shovel could be brought in to the job.
Another incident that occurred in the spring of 1952 which clearly demonstrates this operator’s disregard for the safety of fellow employees was when Mr. Shad-rick was operating a power shovel with a small crew at Mile 12 on the Glenn Highway. The crew was engaged in removing some pieces of old culvert from the highway borrow pit. The helpers who were engaged in rigging cable from the shovel bucket to the culvert sections had been warned by the foreman that the shovel operator was erratic in his operation and that they should be especially cautious in standing-clear of the machine throughout its normal path of operation. However, in spite of this precaution, one of the helpers narrowly escaped serious injury or death when the operator suddenly and without warning swung the shovel entirely from its normal and necessary path of travel. Only the quick action of the foreman in grabbing the helper by the arm and jerking him out of danger prevented a tragedy.
Further illustrative of other incidents which clearly demonstrate the incompetency and recklessness of this operator is the situation which occurred during the spring of 1951 when Mr. Bert Bruhn, a general foreman in our Anchorage District was supervising a crew loading gravel for the grading of the International Airport Road. During the operation the windshield of a truck was broken when Mr. Shadrick lost control of his temper and dumped a full shovel load of gravel on the cab of the truck. The operator’s display of anger was due to the alleged improper position in which the truck was placed to receive the load.
In the spring of 1952 Mr. Shadrick was detailed to the Cantwell and McKinley Park area to act as operator during the construction of the Menana River bridge. *486 On or about March. 18,1952, Wister E. Williams, Engineering Aid, was working under the stringers that were already in place on the bridge. He was out of the normal path of any swinging load. A load of lumber was being hoisted to the top of the stringers by Mr. Shad-rick to be used as decking. The load of lumber knocked Mr. Williams from the scaffold and caused him to fall a distance of approximately ten feet. The cause of this accident has definitely been established to have been due to the careless handling of the controls by the shovel operator, Mr. Shadrick.
On this same job the operator dropped the leads approximately ten feet while one of the helpers was on top of the leads rigging. This could have resulted in a very serious injury, and the foreman discussed the causes with the operator. He claimed the brakes slipped; the foreman checked the machine, operating it himself, and could find nothing mechanically wrong with it. The brakes proved to be m good operating condition. Again, a short time later, the operator dropped the leads in precisely the same manner for a distance of approximately three feet, with the same helper involved and engaged in rigging on the leads.
_ Immediately subsequent to these incidents, Mr. Shad-rick injured himself by inadvertently driving a peavey through his foot and was returned to his headquarters at Anchorage for treatment. He was not returned to the Cantwell job for the reason that the foreman and the men working in the crew were afraid to work on the job if Mr. Shadrick was operating the machine. The District Engineer was requested not to return Mr. Shad-rick to the Cantwell job as an operator, since he was too flighty and unsure of himself to be trusted in such a position as shovel or pile driver operator.
We have submitted the foregoing in order to provide the Board with a resume of the employee’s work history with the Alaska Koad Commission, and to outline in detail incidents which are conclusive that the employee was a careless and incompetent operator who endangered the health and lives of fellow employees and who carelessly caused excessive and extensive damage to Government property.
We are convinced that the action by the Alaska Eoad Commission in discharging this employee was completely justified, and respectfully request that the Board of Appeals and Review reexamine the case.
All statements in this communication will be substantiated under oath if a rehearing is authorized, or, if *487 the Board prefers, we will submit authenticated affidavits in support thereof.
I will be in Washington the week of October 12,1953, for Budget Hearings, and will communicate with you further at that time. It is possible that I may be. of some assistance to you in relation to the reexamination of this case.
(b) On October 26, 1953, the Chairman of the Board of Appeals and Beview forwarded a copy of the foregoing letter to the Washington office of the AFGE, and requested a reply within 15 days.
(c) On November 10, 1953, the Legislative Representative, AFGE (Washington office) replied to the Board of Appeals and Review.
In response to your communication of October 26, 1953 * * * our Federation desires to express strenuous objections to any further consideration of the case.
After reviewing the submission of Mr. A. F. Ghig-lione of October 1, 1953 to the Board of Appeals and Review, it is apparent that its contents consist either of repetitious or irrelevant material or secondary testimony, which could have been produced at the hearing of February 10,1953. The real significance of the Road Commission’s submission is aptly stated in the final sentence of unnumbered paragraph 3, page 1, “In reviewing the evidence which was developed in support of the charge of negligence against the operator in this case, we have found mat there have teen omissions of factual information and lack of development of some of the evidence that was produced both in the written charges and the hearings.”
It is our strong contention that these incidents of laxity on the part of the agency in presenting its case at the regional and Board of Appeals levels should not reflect adversely on the employee.
A review of some of the events incident to the Board’s original consideration of Mr. Shadrick’s appeal is pertinent here. Despite his request, the employee was not granted a hearing in the Eleventh Region prior to consideration of his case by the Board of Appeals and Review. In December, 1952, our Federation recommended that the Board arrange such a hearing. In fairness to the then-appellant (Shadrick) and the agency, we suggested the hearing be held at Anchorage, Alaska, the scene of events leading to Mr. Shadrick’s separation. The recommendation for conducting the *488 hearing in Anchorage rather than Seattle was based npon our desire to conserve agency funds, since witnesses would not have to travel to the United States. Likewise, it would not be necessary for Mr. Shadrick’s witnesses to undergo the prohibitive expense of going to Seattle for the hearing. Finally, the AFGE recommendation was predicated upon our desire to have a Civil Service Commission representative present on the scene so that the machinery in question, as well as the employees involved, could be seen in person and a hearing record could be developed,. which would give to the Board of Appeals and Eeview a clear and concise picture of all available evidence.
The hearing was held in Anchorage, Alaska, February 10, 1958. Both the agency and the then-appellant had a full opportunity to present any pertinent testimony.
Fundamentally, the agency in its October 1 communication is attempting to retry a case on the same issues and essentially the same evidence as was used earlier. Since these matters have been considered heretofore by the Board, we can find no justifiable reason for rendering a decision different from that made originally by the Board.
:}: íjí % sfc
If we were to follow the agency’s approach, we would commence to redevelop at some length evidence in the record favorable to Mr. Shadrick including: (1) The employee’s good record in the past; (2) Mr. Heilman’s contradictory evidence; (3) The condition of the clam shovel prior to the time the employee began to operate it (see Lynch affidavit); (4) Failure of the supervisor, Mr. Bruhn, to examine the equipment prior to Mr. Shadrick’s operating it; (5) Failure of the agency to provide periodic inspection of this type of machinery.
The central issue in this case, however, is whether Mr. Shadrick operated the clam shovel carelessly. There were two eye witnesses to the accident — Mr. Shadrick and Mr. Heilman. The latter’s testimony is contradictory. Furthermore, Mr. Heilman’s version of how the incident occurred is, to say the least, not precise.
In view of Mr. Shadrick’s undisputed testimony as to what actually happened and the defects in the equipment he was operating, we are thoroughly convinced the Board’s action in restoring Mr. Shadrick to his position was fully justified and should not be reconsidered.
*489 Basically, the Bead Commission’s submission of October 1 is simply a reiteration and expansion of evidence in the record prior to or developed during the hearing of February 10, 1958. If there is any significant new evidence — and we can find none — it could and should have been produced at the hearing. The specific purpose of the hearing was to enable the agency and employees to present and develop fully all pertinent testimony. Much time and money were expended by the Civil Service Commission in arranging the hearing in Alaska solely to accomplish that objective. It would be unfair and uneconomical to approve an additional hearing to reexplore testimony which already appears in the file.
Since there is no inequity which can be corrected by additional consideration and a modification of the present decision would be patently unjust to Mr. Shadrick, our Federation is confident the Civil Service Commission will bar any further consideration of the appeal.
(d) On November 17, 1953, the Board of Appeals and Review transmitted a copy of the foregoing letter to the Commissioner of Roads, ARC. On December 7, 1953, the Commissioner of Roads replied:
* * * iji ifc
The letter of the American Federation of Government Employees is in the nature of a protest against reconsideration by the Board of Appeals and Review of the Board’s decision on the appeal of Mr. Glenn L. Shad-rick, former employee of the Alaska Road Commission who was separated from the service for cause.
We appreciate the opportunity of commenting on this letter and regret that Mr. McCart considers the contents of our letter of October 1, 1953, as repetitious or irrelevant. We believe that all of the additional material and information which we presented was completely relevant, and every effort was made to avoid repetition, except when necessary for emphasis. Naturally we cannot agree that the submission of additional factual information and development of evidence should be prohibited for the reason that it reflects adversely on Mr. Shadrick, as contended by Mr. McCart. The Alaska Road Commission recognizes Mr. Shadrick as a careless, negligent and, now, dangerous operator, and our objective is to furnish the Board of Appeals and Review a true and complete recital of the circumstances in order *490 that the Board will be able to give fair reconsideration to the case. There is no personal animosity at issue as has been suggested. We are vitally concerned with the best interests of the Government, and are fully cognizant of the fact that the reemployment of Mr. Shad-rick would be most detrimental to those interests.
*****
It is our desire to provide the Board with accurate and complete information. Our request that the Board reconsider its decision is based on the realization that the facts of the case have not been properly presented heretofore. It is evident that the Board did not have an accurate report of all factors involved. The primary purpose of this letter is to ameliorate that situation and, by the use of the enclosed photographs, we will demonstrate beyond any doubt that Mr. Shadrick was careless and negligent in the operation of equipment and endangered the life of a fellow employee and caused excessive damage to equipment. As was stated in my letter of October 1, 1953, our object in presenting the employment history on Mr. Shadrick with frequent reference to previous incidents of carelessness was to demonstrate that the termination of Mr. Shadrick’s employment was not unwarranted on the part of the Alaska Road Commission. Naturally we consider the careless act of Mr. Shadrick in endangering the physical well-being of a fellow employee as the most urgent and compelling reason for the separation. Had Mr. Shad-rick been inexperienced in the operation of the equipment, or had the equipment been in faulty condition, our actions would have been less drastic.
It is evident that the experience of the operator and the condition of the machine, or those portions of the machine which were directly involved in the accident, were neither adequately nor accurately emphasized in the Summary of the Hearings.
As indicated in my letter of October 1, page 2, paragraph 2, Mr. Shadrick had many months of experience on the type of machine which he was operating at the time of the accident. He was first assigned as a shovel operator in the spring of 1950 and had operated equipment of identical type until his separation in the summer of 1952. The same type of equipment is used for either shovel, dragline, clamshell, or piledriving operations, except that for shovel work a different boom is utilized. The controls are precisely identical, of course, inasmuch as the machine is the same. It is a fact that the clamshell which Mr. Shadrick was oper *491 ating requires the least operational skill of any of the stated uses. Operation of the machine by Mr. Shad-rick was not continuous, of course, since during the winter months equipment of this nature is used infrequently. However, it is obvious from the record that he is an experienced operator of such equipment, consequently his carelessness is unpardonable.
The mechanical condition of the machine has been the subject of considerable discussion as relating to (a) the accident which involved a fellow employee, and (b) the damage sustained by the machine, both resulting from the carelessness of the operator. The Board should be apprised of the fact that although the machine was purchased in 1949, as testified by Mr. Hatchett, it has been determined that its actual total use as of June 1952 was not in excess of 225 days.
sjs # * ❖ *
The Alaska Road Commission is confident that under the circumstances as presented the separation action was completely justified. Mr. Shadrick was an experienced operator, and the machine to which he was assigned was in good operating condition. The mechanical deficiencies which Mr. Shadrick alleged were non-existent for the greater part. Where any deficiencies might have existed they were of such minor nature as to be unrelated to the cause of the accident or damage to the machine.
Permit me, again, to express my appreciation of the opportunity to clarify the circumstances of this case and to reiterate our plea that, upon such evidence as we have presented, the Board reconsider its previous decision. If we can offer any further information, or, if my presence, or the presence of any of my staff, should be desired in Washington, please do not hesitate to advise me of your wishes in the matter.
(e) On December 11, 1953, the National President of AFGE wrote to the Chairman of the Civil Service Commission:
I am compelled to invite your personal attention to the case of Mr. Glenn L. Shadrick currently under consideration by the Commission’s Board of Appeals and Review. Mr. Shadrick was an employee of the Alaska _ Road Commission, Department of Interior, until his removal for cause effective July 21, 1952.
The employee presented to the Eleventh Civil Service Region an appeal from the separation action. Al *492 though he had requested a hearing at the regional level, the hearing was not provided and Mr. Shadrick was given an unfavorable decision by the Eegional Office. He then referred the case to the Board of Appeals and Eeview. In December 1952, our Federation recommended to the Board that the hearing requested be arranged in accordance with statutory requirements. In an effort to ascertain all the facts, the AFGE suggested that the hearing be held in Alaska. Our request was concurred in, and a hearing transpired in Anchorage on February 10, 1953. Both the agency and the employee-appellant had a full opportunity to present any pertinent testimony.
In a decision dated September 8, 1953, the Board of Appeals and Eeview directed Mr. Shadrick’s retroactive restoration to duty as a shovel operator.
The Alaska Eoad Commission, on October 1, 1953 requested the Board to “re-examine the case.” Our Federation was provided with a copy of the agency’s six-page communication appealing the Board’s decision favoring Mr. Shadrick. On November 10, 1953, the AFGE forwarded to the Chairman of the Board of Appeals and Eeview a five-page rebuttal of the Alaska Eoad Commission’s request for review. Several days ago, we had occasion to contact the Board to determine the status of the case. Much to our surprise, we were informed that the Board had provided the Alaska Eoad Commission with a copy of our rebuttal of November 10, 1953 and that the agency would be permitted to make additional comments on the AFGE communication refuting the Eoad Commission’s position. Furthermore, we were advised, when the Eoad Commission had submitted to the Board any additional comments it cared to make on our rebuttal of the agency’s request for re-examination, the AFGE would be given an opportunity to refute this latest submission.
It seems to us that unwarranted, unusual and unnecessary steps are being taken by the Board to establish the merits of this case. A hearing was held near the scene of the incidents leading to Mr. Shadrick’s removal for the specific purpose of developing all available testimony. Following receipt of this information, the Board then rendered a decision. Now we are witnessing a series of rebuttals and re-rebuttals which can proceed endlessly without establishing any new evidence or testimony that could have and should have been produced at the hearing.
Bearing in mind that Mr. Shadrick was removed from *493 Ms position approximately a year and a-half ago, it seems fruitless for the agency and the employee’s representative as well as the Board of Appeals to be engaged in continued exchanges of correspondence, wMch can produce no effective result so far as the merits of the case are concerned. Each exchange of letters is simply adding to the delay already encountered in the case. So far as our Federation and the original appellant are concerned, we are quite content to rest on the decision of the Board, the Boad Commission’s request for re-examination dated October 1, 1953 and our refutation of the agency’s position dated November 10, 1953. It is our contention, of course, that the facts of record do not warrant further consideration.
In the interest of equity to all parties concerned, I urge that steps be taken to halt the appeal at that point.
(f) On March 3, 1954, the Administrative Assistant to the Secretary of the Interior wrote to the Chairman of the Civil Service Commission:
There is now pending before the Board of Appeals and Eeview of the Civil Service Commission an appeal in the case of Glen L. Shadrick, who was removed for cause from his position as an employee of the Alaska Boad Commission on July 21, 1952. The appeal in question was initiated by the Commissioner of Boads for Alaska, Mr. A. F. Ghiglione, as a consequence of a letter of September 8, 1953, from Chairman Blann of the Board of Appeals and Eeview, which directed the retroactive restoration of Mr. Shadrick to Ms post with the Boad Commission.
I thiuk you should know that the action of the Boad Commission in removing Mr. Shadrick for cause was upheld by the hearing officer from the Seattle office of the Civil Service Commission. In addition, the presentation of the Boad Commission by its letters of October 1, 1953, and December 7, 1953, to the .Board of Appeals and Eeview has been reviewed here and in our opinion the information contained therein fully supports the action that was taken. There is no evidence that the Boad Commission officials acted with malice or arbitrary intent in discharging Mr. Shadrick. There is evidence, however, that the Boad Commission acted in the interest of good management practices, since Mr. Shadrick apparently failed to correct Ms careless habits after full opportunity to do so. In a case requiring safe operations on a project such as tMs where carelessness may result in the loss of life, or *494 destruction of valuable equipment, that could cost the Government thousands of dollars, it is believed that the judgment of the Road Commission should be given particularly heavy weight because of its technical knowledge of engineering equipment.
I think, therefore, if this case is judged on the facts as presented by the Road Commission that the Civil Service Commission will necessarily arrive at the conclusion that Mr. Shadrick’s separation was the only course open since he had failed to respond to reasonable instruction in the operation of the equipment assigned to him.
I am concerned that our efforts to improve the caliber of personnel in the Federal Government will be endangered should we be required to continue the employment of Mr. Shadrick. This is the principal reason why I am calling this matter to your personal attention.
26. On June 4, 1954, the Chairman of the Board of Appeals and Review of the Civil Service Commission wrote the following letter to the Commissioner of Roads, ARC, “by direction of the Commission.” Copies were sent to plaintiff, the Legislative Representative of the AFGE (Washington), the District Engineer, ARC (Anchorage), the Director of Personnel of the Department of the Interior, and to the Regional Office of Civil Service (Seattle).
Reference is made to the appeal of the Alaska Road Commission, Department of the Interior, from the decision of the Board of Appeals and Review reversing the decision of the Eleventh Civil Service Regional Office which sustained the removal action of the Alaska Road Commission and recommending that Mr. Glenn L. Shadrick be restored retroactively to his former position.
The Commissioners, as the result of a careful study of all the evidence developed in this case, including your representations and those of the American Federation of Government Employees in behalf of Mr. Shad-rick, have determined that the removal action was justified. Consequently, the decision of the Board of Appeals and Review is hereby rescinded and the decision of the Director, Eleventh Civil Service Regional Office, a copy of which was furnished you, is affirmed.
27. Following is the text of section 14 of the Veterans’ Preference Act of 1944.[15]
*495 No permanent or indefinite preference eligible, who has completed a probationary or trial period employed in the civil service, or in any establishment, agency, bureau, administration, project, or department, herein-before referred to shall be discharged, suspended for more than thirty days, furloughed without pay, reduced in rank or compensation, or debarred for future appointment except for such cause as will promote the efficiency of the service and for reasons given in writing, and the person whose discharge, suspension for more than thirty days, furlough without pay, or reduction in rank or compensation is sought shall have at least thirty days’ advance written notice (except where there is reasonable cause to believe the employee to be guilty of a crime for which a sentence of imprisonment can be imposed), stating any and all reasons, specifically and in detail, for any such proposed action; such preference eligible shall be allowed a reasonable time for answering the same personally and in writing, and for furnishing affidavits in support of such answer, and shall have the right to appeal to the Civil Service Commission from an adverse decision of the administrative officer so acting, such appeal to be made in writing within a reasonable length of time after the date of receipt of notice of such adverse decision: Provided, That such preference eligible shall have the right to make a personal appearance, or an appearance through a designated representative, in accordance with such reasonable rules and regulations as may be issued by the Civil Service Commission; after investigation and consideration of the evidence submitted, the Civil Service Commission shall submit its findings and recommendations to the proper administrative officer and shall send copies of same to the appellant or to his designated representative: Provided further, That the Civil Service Commission may declare any such preference eligible who may have been dismissed or furloughed without pay to be eligible for the provisions of section 864 of this title.
28. Following is the text of the applicable regulations of of the Civil Service Commission.[16]
Seo. 22.1(a) (1) Employees covered. Employees affected are permanent and indefinite preference eligible employees who have completed a probationary or trial period in positions under the Civil Service Rules or War *496 Service Regulations, or one year of current continuous employment in positions excepted from the competitive service, in the service of any establishment, agency, bureau, administration, project or department created by acts of Congress or Presidential order or in the service of the District of Columbia. * * *
Sec. 22.1 (2) (iv) Those ex-service men and women who have served on active duty in any branch of the armed forces of the United States during any war, or in any campaign or expedition (for which a campaign badge has been authorized), and have been separated therefrom under honorable conditions.
Sec. 22.1(3) Adverse decisions which may be appealed. Appeals may be made from the decisions of administrative officers in cases of discharges, suspensions for more than thirty (30) days, furloughs without pay and reduction in rank or compensation for reasons other than reduction in force which are covered by reduction in force regulations.
Sec. 22.2(a) Advance written notice of at least thirty full days. No employee covered by the regulations in this part shall be discharged, suspended for more than thirty (30) days, furloughed without pay, reduced in rank or compensation, or debarred for future appointment except for such cause as will promote the efficiency of the service and for reasons given in writing, and the employee whose discharge, suspension for more than thirty (30) days, furlough without pay or reduction in rank or compensation is sought shall have at least thirty (30) full days advance written notice stating any and all reasons, specifically and in detail, for any such proposed action * * *. In other words, the advance notice which is required when a proposed action is sought by an employing agency shall be submitted to the employee at least thirty (30) full days before the effective day of such proposed action, not counting the day on which the notice is given to, or received by the
Seo. 22.2(b) Reasonable time to answer. A reasonable time shall be allowed employees for answering personally and in writing, charges and notifications of proposed adverse actions, and for furnishing affidavits in support of such answers, and the reasonable time required shall depend on all the facts and circumstances of each case, and be sufficient in all cases to afford the employee ample opportunity to prepare answers and secure affidavits.
Seo. 22.3 Adverse decisions of administrative officers *497 of agencies. Adverse decisions by administrative officers following notifications of proposed adverse actions, charges, and answers of employees, shall be in writing, dated and submitted to the employee promptly after such decisions have been made. The employee should at the same time be advised of his right to appeal the decision to the Civil Service Commission. * * *
Sec. 22.4 Appeals to the Commission; time limit. The Commission will not entertain aE. appeal for consideration or review of any action under section 14 of the Veterans’ Preference Act of 1944 prior to an adverse decision mating effective the discharge, suspension for more than thirty (30) days, furlough without pay, or reduction in rant or compensation. Ten (10) days after the effective date of the adverse decision shall be considered as a reasonable time to prepare and submit an appeal under this section. This time limit may be extended in the discretion of the Commission only upon showing by the employee that circumstances beyond his control prevented him from filing an appeal within the prescribed ten (10) days.
Sec. 22.5 Form of appeal — (a) Contents. The appeal of the employee to the Commission shall be in writing and (1) shall set forth in detail all the facts and circumstances of the adverse decision; (2) shall be accompanied by copies of charges, answer, affidavits in support of answer, and notice of the adverse decision, and by such documentary evidence in support of the appeal as the employee may wish to submit; (3) shall state whether the employee desires to make a personal appearance or an appearance through or accompanied by a representative designated by him before a representative of the Commission; (4) shall be supported by acceptable evidence of entitlement to preference and (5) shall set forth detailed information regarding the employee’s status, such as the date and nature of appointment and whether the employee has completed a probationary or trial period or 1 year of current continuous employment in the civil service of the Federal Government or District of Columbia, and any other data bearing on whether the employee is within the purview of the regulations in this part.
Sec. 22.6 Where appeals shall be filed. Appeals from employees * * * shall be submitted to the Director of the appropriate Civil Service Region or Manager of any Branch Regional Office.
Sec. 22.7 Preliminary consideration of appeals in the Commission. When an appeal is received it will be *498 examined for the purpose of determining whether or not it is within the scope of Public Law 859 and the regulations in this part. If the determination is that it is not, the employee will be so advised and informed as to the basis for such determination. * * * If it is found to be an appeal within the purview of Public Law 359 and the regulations in this part it will be docketed for investigation and adjudication and the employee or his designated representative and the employing agency will be so advised.
Sec. 22.8 Investigations — (a) When made. Investigations will be made as necessary, to develop all the facts and circumstances relative to the adverse decision and to obtain necessary copies of the official record, charges, answer, decision and the reasons therefor, and pertinent testimony of witnesses.
(b) Manner of taking testimony. Testimony of witnesses will be by affidavit, without any pledge of confidence, but where it is impracticable to obtain testimony under oath from a witness such statement will be obtained, without any pledge of confidence, from the witness as the circumstances will permit, and such weight will be given to the unsworn testimony as the record will warrant. * * *
(c) Information obtained discussed with agency and with employee. The evidence submitted by the employee in connection with his appeal will be discussed by the investigator of the Commission with the administrative officer who made the decision and other proper officials of the employing agency concerned, and such officials shall be requested to state their side of the case. Similarly, the employee should be informed of the information furnished by the officials of the agency and given the opportunity to insert his side of the case into the record of investigation. * * *
Sec. 22.9 Hearings — (a) Eight to appear personally or by representative. The appellant shall have the right to appear personally or through or accompanied by a designated representative in connection with his appeal and if an appellant has expressed the desire for such a personal appearance arrangements will be made for a hearing at a stage of the proceedings agreed upon between the appellant and the regional office or the office of the Chief Law Officer, as the case may be.
(b) Notice of hearings and where scheduled. The hearing will be scheduled at Washington, D.C., or at any regional office or branch regional office and notifications thereof transmitted to the appellant or his des *499 ignated representative and to tlie employing agency, advising the latter that it may participate and informing both parties of a right to produce, evidence and witnesses: Provided, however, That regional directors may, within the limits of their resources, because of distance involved hold local hearings. outside regional or branch office cities whenever, in their discretion, this appears necessary in the light of all circumstances in a specific case; such as, distance from the regional or branch office, number of agency witnesses or other participants who would need to travel at government expense, or whether additional information or records may need to be developed or obtained locally during the course of the hearing.
(c) How conducted. Hearings will be conducted by a representative of the Commission in an informal manner with an opportunity afforded for the introduction of evidence, including testimony and statements by the appellant and his designated representative and witnesses and representatives of the employing agency and witnesses, and for the cross-examination of witnesses: * * *.
(d) Admission of evidence. Eules of evidence will not be strictly applied during hearings, but the Commission representative in charge of the hearing shall use reasonable discretion to exclude irrelevant testimony.
(e) Testimony taken under oath; record of hearing; not open to public. The testimony at hearings shall be under oath. The Chief Law Officer or the Eegional Director may direct that the hearing be recorded steno-graphically by a reporter employed by the Commission. The reporter’s transcript shall be a part of the record of the proceeding. Eeporters not employed by the Commission shall not be permitted to make transcripts of the proceedings. In cases where the hearing is not recorded stenographically, the hearing examiner will make suitable notes of the relevant portions of the testimony. At the conclusion of the hearing, these notes shall be summarized and when agreed to m writing by all parties concerned, the summary shall constitute the report of the hearing. If the examiner and the parties cannot agree on the summary, the parties shall be permitted to submit, in writing, exceptions to any part of the summary that they question, and such exceptions shall be considered in connection with the making of the finding and recommendation. * * *
Seo. 22.10 Decision in the Commission — (a) By whom made; contents. The decision on the appeal shall *500 be made by the Chief Law Officer or the regional office as appropriate, in a formal finding, consisting of an analysis of the evidence, the reasons for the conclusions reached and a recommendation for action to be taken by the employing agency concerned: * * *.
Sec,. 22.10(b) Copy of decision furnished appellant and agency; appeal to Commissioners. Copies of the analysis, conclusions and recommendation shall be furnished to the employing agency and to the appellant or his designated representative, and both parties shall be notified of the right of a further appeal to the Commissioners of the TT.S. Civil Service Commission, Washington 25, D.C.
Sec. 22.10(c) Eeport by agencies to Commission of action taken or proposed to be taken on finding favorable to employee. When the finding and recommendation is that the employee be restored to his position, or is otherwise favorable to the employee, the employing agency will, at the time the finding and recommendation is transmitted to it, be requested to report to the Chief Law Officer, the regional office or the Loyalty Eating Board, as the case may be, within seven (7) days of the receipt of such finding and recommendation, regarding the action taken or proposed to be taken by the employing agency.
Sec. 22.11 Further appeals to the Commissioners— (a)Time limit for filing. An appeal may be made by the employee or the employing agency from a decision sion of the Chief, * Appeals Examining Office* or regional director to the Commissioners, TJ.S. Civil Service Commission, Washington 25, D.C. within seven (7) days of the date of receipt of notification of the decision. This time limit may be extended in the discretion of the Commission only upon a showing that circumstances beyond the control of the employee or the employing agency prevented the filing of a further appeal within the prescribed seven (7) days.
(b) Deferred to Board of Appeals and Eeview. Appeals under this regulation shall be referred to the Board of Appeals and Eeview of the Commission in Washington, D.C., for appropriate action.
(c) Board of Appeals and Eeview procedures. The Board of Appeals and Eeview will review the entire record of such further appeals. In its discretion, the Board may afford the parties an opportunity to appear personally and present oral arguments and representations on the procedural aspects of the case and merits of the appeal, but no evidence will be considered by the *501 Board which could have been submitted at the time of the original appeal to the ‘"Appeals Examining Office* or regional office. If alleged new evidence is offered which was not available at the time of original appeal, the Board will consider whether the evidence is actually new and of such material consequence that the case should be remanded to the office of original jurisdiction. In exceptional cases the Board may in its discretion receive and consider new evidence without remanding the case and may afford the parties an opportunity to produce witnesses and cross-examine witnesses.
(d) Decision on further appeals. Decisions on appeals to the Commissioners will be transmitted to the appellant or his designated representative and the employing agency concerned with notifications to both parties that no further appeals will be entertained as to the particular case unless new and material evidence is submitted.
(e) Reopened appeals. The Commissioners may in their discretion, when in their judgment such action appears warranted by the circumstances, reopen an appeal at the request of the appellant, or his designated representative, or the employing agency concerned and may grant both parties an opportunity for a personal appearance. In connection with such reopened appeals, both parties will be afforded an opportunity to submit briefs or written representations.
29. (a) Plaintiff was never employed by ARC after July 21, 1952.
(b) Following his discharge by ARC, plaintiff diligently sought employment elsewhere. His efforts, during the remainder of 1952 and through March of 1956, were only moderately successful. He would have earned more if he had been retained by ARC. Neither of the parties has indicated in requested findings the evidence to be relied upon in determining plaintiff’s earnings after April 1,1956.
(c) In the absence of adequate requests by the parties for findings relating to lost wages, further proceedings under Rule 38(c) will be required to determine the amount of recovery and the amount of offsets if plaintiff is entitled as a matter of law to recover.[17]
*502 CONCLUSION OF LAW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect with the amount of recovery to be determined in further proceedings pursuant to Eule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on July 12, 1961, that judgment for plaintiff be entered for $33,159.67.

 The full text of the memorandum appears in finding 6(e).

 The foregoing finding was drafted on the basis of the oral testimony and before the writer considered (or even read) the correspondence, hereinafter noted, directed to the Civil Service Commission by the Commissioner of Roads and the Administrative Assistant to the Secretary of the Interior.

 Compliance with the procedural requirements of the Veterans’ Preference Act of 1944 is mandatory. The act “does not prevent a discharge, if the procedure is followed, but it does forbid a discharge unless it is followed.” (Wittner v. United States, 110 Ct. Cl. 231, 234 (1948). Cf. Elchibegoff v. United States, 106 Ct. Cl. 541 (1946).

 Because the notice of proposed adverse action advised plaintiff only that “it is proposed to effect your removal from your position as shovel operator,” and the agency did not specify in so many words until July 1, 1952, that plaintiff’s employment was to be terminated on July 21, 1952, plaintiff contends that the notice of proposed adverse action was a notice of demotion rather than of *420 discharge, wherefore plaintiff was not given the SO days’ advance notice required by the statute. The contention is not sustained by the facts. Plaintiff knew, on June 18,1952, that he was being fired.

 Ten days earlier, on June 17, 1952 (being the day before the service on plaintiff of the notice of proposed adverse action), the secretary of Lodge 183, AFGE, wrote to the District Engineer requesting “that you hold a hearing to substantiate verbal charges resulting in unwarranted reduction in salary for" plaintiff.

 Plaintiff contends tiiat this “decision” letter was defective, within the meaning of Mulligan v. Andrews, 211 Red. 2d 28 (1854), in that it failed to set forth the reasons for the action taken. The regulations in force at the time required a written statement of “any and all reasons, specifically and in detail,” in the 30-day advance notice, hut provided only that the adverse decision “following notification of proposed adverse action” should be “in writing, dated, and submitted to the employee promptly * * The decision letter of the District Engineer informed him that he was being removed “on the basis of the charge * * * preferred in a written notice to you dated June 18,1952.” The decision letter in Mulligan referred only to “the facts developed during the investigation, and the conclusion » * » that the evidence is such as to show your unsuitability,” there being no reference to the specific charges theretofore made. In the instant case plaintiff was not misled or otherwise prejudiced by the District Engineer’s failure to repeat the charge and specifications.

 Plaintiff contends that he was denied a personal hearing at the agency level within the meaning of Washington v. United States, 137 Ct. Cl. 344 (1957), (deft.’s petition for cert. dismissed 355, U,S. 801). Defendant counters (1) that plaintiff failed, within the context of Hart v. United States, 148 Ct. Cl. 10; to make clear to the agency his desire for a personal hearing at the agency level, and (2) that plaintiff failed, within thei terms of Long v. United States, 148 Ct. Cl. 4, to raise the issue of denial of a personal hearing before the Civil Service Commission. There was enough in the record at the. agency *422 level (it that record was reviewed by the Regional Director of Civil Service) and in plaintiffs initial appeal to the Regional Director to put that official on notice that plaintiff had asked to be heard. Whether or not his requests made clear his desire to be heard by the agency is a close question. The agency denied plaintiff’s request for a hearing by it, and the inference is compelling that it would have denied the request irrespective of the form the hearing might have taken, because the subsisting regulations of the Civil Service Commission did not require a hearing at the agency level. Washington was not decided until 1957, and the requirement was not inserted in the regulations until after that decision.
The instant case serves to emphasize the wisdom of the requirement of a personal hearing at the agency level. If plaintiff had been given such a hearing, he might have been made to understand that actions which he considered discriminatory were not so intended, and the agency might have realized that its notice of proposed action was neither accurate nor complete as a statement of the reasons for the discharge.

 While the Regional Director may have been technically accurate in saying the first indication of plaintiff’s desire for a hearing in Seattle came from the AFGE, his failure to note plaintiff’s repeated requests for a hearing can be accounted for only by failure of ARC to make its files available to him or his own inattention to those files, if he had access to them, and to letters addressed to him by plaintiff.

 Ais indicated in the preceding footnote, the Regional Director appears to Raye paid scant attention to some parts of tRe record. Plaintiff’s letter saying Re did “not wish to cast aside any attempts tRat -would be necessary to gain a decision in my favor” sRould Rave been ample notice that Re did want a Rearing unless the Regional Director was prepared to render a decision in his favor on the record made during the investigation.

 Plaintiff contends that this decision was inadequate in that (1) it was rendered without a hearing and (2) it failed to comply with the requirements (a) of the Commission’s regulations (§ § 22.10(a) and 22.403) and (b) of Mulligan v. Andrews, 211 F. 2d 28 (1954).
Section 22.10(a) of the regulations (finding 28) required the decision on appeal to be made by the Regional Director “in a formal finding, consisting of an analysis of the evidence, the reasons for the conclusions reached and a recommendation for action to be taken by the employing agency * * The text of the Regional Director’s decision is set forth in finding 22(b). The section on “Evidence and Analysis” contained a review of the charge and specifications and of plaintiff’s answer thereto, followed by the Regional Director’s conclusions with respect to them. The findings were likewise conelusory. While the content of the decision may have left something to be desired in explaining the Regional Director’s reasoning, it does not affirmatively appear that plaintiff was prejudiced thereby.
The failure of the Regional Director to afford plaintiff a hearing before the decision was rendered was prejudicial to plaintiff’s interests, inasmuch as plaintiff clearly had asked for one. Had it not been for the request, however (which the Regional Director either misunderstood or ignored), the rendering of a decision without a hearing would not have been contrary to the regulations.

 Plaintiff challenges the validity of the hearing on the ground that the witnesses were not sworn as required by the regulations. (§ 22.9(e), finding 28). Finding 22(d) recites that the evidence is unsatisfactory as to whether or not the witnesses were sworn, and does not warrant a finding either way. under the circumstances the presumption of regularity in administrative proceedings must prevail. Stearns Co. v. United States, 291 U.S. 54, 63 (1933) ; United States v. Royer, 268 U.S. 394, 398 (1924) ; United States v. Crusell, 81 U.S. 1 (1871).
Plaintiff further contends that he was denied the right of cross-examination. In the absence of satisfactory proof of the fact, the same presumption of regularity obtains. The regulations provided for cross-examination of witnesses. § 22.9(c), finding 28.

 § 22.9(e), finding 28. Plaintiff challenges the validity of the regulation, relying on Inland Steel Co. v. National Labor Relations Board, 109 F. 2d 9 (1940), where the court struck down a similar regulation applicable to a public hearing. In the instant case the civil service regulations provided that the hearing should not be open to the public, a fact which complicates the question more than It distinguishes the cases. On the merits, however, it seems unnecessary to decide the point, inasmuch as any prejudice which may have resulted (and none has been shown to have occurred) was rendered moot by the decision favorable to plaintiff by the Board of Appeals and Review of the Civil Service Commission based on the hearing examiner’s summary of the testimony and proceedings.

 The full text of tlie Regional Director’s letter is set forth in finding 24(a). Plaintiff challenges the sufficiency of the letter as a decision, for failure to comply -with section 22.10(a) of the regulations (finding 28), citing Mulligan v. Andrews, 211 F. 2d 28 (1954) and Blackmar v. United States, 128 Ct. Cl. 693 (1954). Defendant supports the decision as an affirmation of the earlier decision, which therefore did not require repetition of the analysis and findings. The situation thus finds a parallel with that portion of Blackmar wherein the court said (p. 706) : “We agree that where the decision of the regional office is merely affirmed on appeal additional findings are unnecessary.” The Regional Director’s second decision in the instant case incorporated the weaknesses of his first decision and added to them by failure to analyze the evidence adduced at the hearing. Here again, however, such prejudice as may have resulted from those weaknesses was rendered moot by the reversal of the decision (holding in plaintiff’s favor) by the Board of Appeals and Review.

 This letter is set forth In full In finding 25(a).

 The exact language of the charge was: “Operation of heavy machinery In such a manner as to endanger other employees and the traveling public.”

 Including the Administrative Assistant to the Secretary, the Commissioner of Roads, the Personnel Officer of ARC, the District Engineer, the Assistant District Engineer, and the general foreman.

 Plaintl£E enlisted as an apprentice seaman V-6 in tie Naval Reserve on February 25, 1942, and was honorably discharged on February 16, 1945. Such service qualified him as a preference eligible under the Veterans’ Preference Act of 1944, 58 Stat. 387, 5 U.S.C. 851-859.

 At all times material to this action the Alasha Road Commission was an agency of the Department of the Interior.

 The District Engineer did not testify. The Assistant District Engineer did not know why the District Engineer took the matter under advisement— whether he wanted to talk to headquarters in Juneau, whether he wanted time to make up his mind, or whether he wanted to review further evidence.

 The charge, specifications, and supporting data, together with procedural steps taken thereafter, are reviewed in detail hereinbelow.

 The Impact of the procedural requirements of civil service regulations upon ARC was illustrated by a remark of the general foreman in charge of the work where plaintiff was using the clamshell, who testified that under the requirements “It takes an Act of Congress to fire a man.”

 This pattern (of claims by union zealots of anti-union bias and discrimination by management, continued in the face of rational and factual explana tions excluding bias and discrimination from management motivation, with re suiting animosity between union organizers and supervisory staff) is a familiar one in union organization. It appeared again and again in union recognition cases arising under section 7(a) of the National Industrial Recovery Act in the 1930’s.
While anti-union bias was usually established as a fact in the NRA cases, claims of discrimination came to be recognized as a technique, sometimes re quiring careful sifting to get at the facts.
The evidence in the Instant case does not establish the existence of discrimination because of union membership, or coercion in any form to prevent or *447 discourage it. What is shown (by inference) is animosity toward plaintiff on the part of the supervisory staff for actions which management considered unfair.
Plaintiff, meanwhile, felt equally abused, having convinced himself, as avid union converts usually do, that discrimination was in fact being used against him because of his union membership and activity.

 Another letter, dated the same day, was written by the president of the local to the Veterans Employment Representative of the Civil Service Commission in Seattle, asking for assistance “regarding an attempted disciplinary action” against plaintiff, because “none of our officers have had occasion in the past to defend a member on the basis of his rights as a veteran.”

 Items already quoted in these findings have been omitted. These include (1) the text ol the specifications supporting the charge against plaintiff (see finding 17 (a)) ; (2) plaintiff’s reply to the District Engineer, dated June 213, 1952 (see finding 17(b)) ; and (3) the District Engineer’s letter to plaintiff of July 1, 1952 (see finding 17(e)).

 Mr. Eugene J. White.

 Mr. L. A. Hatchett.

 Mr. Oliver W. Peterson and Mr. John M. Robinson.

 Mr. Bert H. Bruhn.

 Mr. V. E. McDade.

 The summary contains the clearest and most detailed account of the controversy ever made available to the Civil Service Commission, including its Board of Appeals and Review.

 5 U.S.C. § 863,1946 Ed.

 Part 22, Appeals of Preference Migibles under tie Veterans’ Preference Act of 1944, Federal Personnel Manual.

 The parties have joined issue in their briefs on the question as to whether lost wages are to be computed on the basis of the rate received at the time of discharge or should include rate increases made applicable since that time.